**CONTINENTAL BUS SYSTEM, INC., et al.,**
Appellants,

v.

**Alton M. TOOMBS et al., Appellees.**

No. 15989.

Court of Civil Appeals of Texas.

Fort Worth.

April 24, 1959.

Supplemental Opinion May 22, 1959.

Rehearing Denied May 22, 1959.

**156**

———◆———

Strasburger, Price, Kelton, Miller & Martin, Dallas, for appellants.

Bullington, Humphrey, Humphrey & Fillmore, and H. W. Fillmore, Wichita Falls, Jackson, Walker, Winstead, Cantwell & Miller, L. P. Bickel and D. L. Case, Dallas, for appellee B. F. Goodrich Co.

Abner V. McCall, Waco, Mock & Spell and C. Coit Mock, Wichita Falls, for appellee Toombs Family.

MASSEY, Chief Justice.

Suit from which the appeal is taken was initiated by Alton M. Toombs and others against Continental Bus System, Inc., the B. F. Goodrich Company, and others. Predicate for the suit lay in a serious collision between a bus operated by the Continental Bus System, Inc., and the automobile of Mr. Toombs. The collision occurred at about 7:50 p. m. on the 16th day of August in 1957, on Texas State Highway 114, about two miles east of Rhome, which is in Wise County, Texas. It occurred when the left front tire on the bus "blew out" causing the bus to veer to its left and across the road into the Toombs automobile.

As a result of the collision Mr. Toombs was seriously and permanently injured and his wife, Wilma Toombs, received injuries resulting in her death. Upon the trial, based upon jury findings made, Mr. Toombs was awarded damages on account of his own personal injuries in the sum of $85,000, and a further amount as damages, on account of the death of his wife, in the sum of $60,000. There were two children of Mr. and Mrs. Toombs, one of whom, Mrs. Gwendolyn Toombs Whitson, was awarded $10,000 in damages on account of the death of her mother, and the other, Gary Michael Toombs, was awarded $50,000. As we view the case on appeal, the most material attack made by the appellants is upon the foregoing findings as to damages. It is insisted that as applied to each of the findings, they were so excessive as to indicate that the jury was activated by passion, prejudice or other improper motive in arriving at its answers, and the trial court erred in not requiring a remittitur as to each item of damages.

There is additional contention that plaintiffs/appellees' attorney failed to fully dis-

cuss damages in the opening argument, and that the closing argument was improper and inflammatory in the discussion of Mr. Toombs' damages from pain and suffering. Further, complaint is made of the attorney's appeal to the jury to "hang" rather than agree to any finding that Toombs was guilty of contributory negligence, with assertion that such amounted to information given to the jury of the effect of its answers.

The judgment entered was against the Continental Bus System, Inc., and the driver of its bus at the time of the collision, one J. W. Davis.

Although the jury had found that the B. F. Goodrich Company, a defendant, failed to properly inspect, or cause to be properly inspected, the tire in question (which "blew out") on the 15th day of August, 1957, after it arrived at the Continental Bus Garage in Dallas, and that such failure was a proximate cause of the collision in question, the trial court, on motion, disregarded these answers. It refused to decree judgment of damages against the B. F. Goodrich Company in behalf of the Toombs plaintiffs, jointly or severally with the defendants in judgment Continental and Davis, or to decree judgment in favor of Continental and Davis over against B. F. Goodrich Company, either for indemnity or contribution. Such form of relief had been sought by Continental and Davis.

On the appeal, Continental and Davis complain of judgment against them in favor of the Toombs, and also of the denial of relief sought against Goodrich. Their supersedeas bond is in accord with their contentions. Goodrich filed an appeal bond in preservation of its contentions as against the Toombs. Said Company has assigned a cross-point of error (conditioned upon any contingent appellate holding against it), preserving its contention that if it should be held liable to the Toombs it would nevertheless be entitled in that event to a judgment for indemnity against Continental on the theory that its own negligence was merely passive while that of Continental

was active. The Toombs have a cross-assignment of error complaining of the failure of the trial court to render judgment for them as against Goodrich, as well as against Continental and Davis.

It is observed that the jury made findings against Continental and its driver to the effect that the bus was being driven at an excessive rate of speed immediately prior to the collision, which was a proximate cause thereof; it was being driven in excess of 55 miles per hour, which was a proximate cause; its driver, Davis, failed to maintain proper control of the bus, which was a proximate cause; and also failed to make proper application of the brakes on the bus, which was a proximate cause. The jury further found that Continental failed to make, or cause to be made, a proper inspection of the left front tire on the bus on the 15th and 16th days of August, 1957, prior to the time of the collision, and that such failure was a proximate cause of the collision. All of said issues relate to the negligence of the appellants before us.

■ We have examined the record in connection with said findings, and as related to Continental's (and Davis') points of error Nos. 16, 17, and 18, have concluded that said points should be overruled under provisions of Texas Rules of Civil Procedure, rule 434. In explanation, we will state that the Toombs offered the testimony of a Mrs. Riley, who was a passenger on the bus at the time of the collision. She had filled in a questionnaire for the Bus Company sometime subsequent to the collision in which she had stated: (1) She was a passenger on the bus (2 and 3) at the time and place of the collision, and (4 and 5) was injured in the accident; (6) that the accident occurred as the result of a blowout on the left front wheel; (7) that the bus operator did sound his horn; (8) in reply to question, "Do you consider bus driver at fault?" she had answered "No"; (9 and 10) her destination point and address were given. She had signed the statements made in the questionnaire. On direct ex-

amination Mrs. Riley had testified that after the "blowout" the bus driver acted like he was paralyzed and that he did not turn to either the right or the left, or apply his brakes prior to the time of the collision.

The attorney for Continental and Davis was seeking on cross-examination to impeach Mrs. Riley's testimony. He offered the questionnaire and the answers. Objection was interposed to sections 6 and 8 of the exhibit on the ground that no direct testimony had been offered from the witness as to her conclusions upon the fault in the collision, and that the matter of causation in the accident invaded the province of the jury. The objection was sustained and the offer of the exhibit or any part of it was withdrawn. Then a narrative form statement taken from Mrs. Riley on August 23, 1957, was introduced by Continental's attorney, which stated substantially the same facts as noted on the exhibit, except for absence of any conclusion upon the fault of the bus driver. There was evidence from several other witnesses which corroborated the testimony of Mrs. Riley upon direct examination in every material particular. In view thereof, we perceive no probability that Continental and Davis suffered harm, aside from our conclusion that the exclusion of the evidence was proper action by the trial court.

■ Point No. 11 of Continental and Davis predicates a contention of error upon an argument made by the Toombs' attorney relative to the contributory negligence issues. It is to be noted that the jury found that the collision was not the result of an unavoidable accident, and that Toombs did not fail to keep a proper lookout, did not fail to properly steer the automobile before the collision, did not fail to make proper application of the brakes on the automobile, and did not fail to drive and operate the automobile at a prudent speed.

The complaint in the eleventh point of error is that the trial court should have granted a new trial because Toombs' attorney "in effect" told the jury the legal effect of their answer to the issues on contributory negligence by way of appeal to the members to hang the jury rather than find any contributory negligence. Bill of Exception No. 33 shows the argument to have been as follows: "Ladies and Gentlemen, if you don't listen to another thing I've said, under this evidence, never come back through that door answering (that) the driver of this Oldsmobile did anything that caused this accident. I'd rather you would come out of there, under this evidence, come out of that jury room and say, Your Honor, we are hung. If there is any one member of your jury that want to attribute any part of this accident to the driver of the Oldsmobile then come out—" (Here follows the objections to the argument, motion for mistrial on account of it, etc. The court refused the motion for mistrial, but sustained the objection to the argument and instructed the jury not to consider it.) Then the argument proceeded, as follows: "Under this evidence, Ladies and Gentlemen, if you answered one of those issues, I do not believe that you could sleep tonight all night. You will be required to answer those issues under this evidence and under your oath. If there is one of you who believes otherwise, I ask the other eleven of you to hang that jury and bring that charge back out. Thank you."

The instruction given the jury to disregard was upon the objection that counsel was telling the jury how he, himself, wanted the issues answered, rather than arguing upon the proper answers to be returned in light of the evidence. Hence, according to Toombs' counsel, the different wording in the argument which followed.

We see no error in the argument counsel made. If it was error it would not be reversible under provisions of T.R.C.P. 434. Indeed, the state of the record was such that any answer of the jury finding contributory negligence would probably have been against the great weight and preponderance of the evidence.

■ At this stage of the opinion we will consider the matter of the propriety of the trial court having relieved Goodrich of liability. Continental contends that under the answers returned by the jury Goodrich should have been a defendant in judgment along with it and its driver, and that under the record amounts for contribution as between said defendants should have been made a part of the judgment. Furthermore, it is contended that under and by virtue of a certain contract between Transcontinental Bus System, Inc., and B. F. Goodrich Company, it was intended that indemnity' should be thereby afforded Continental.

For a proper understanding under the contract feature, it might be explained that for the purposes under consideration the Transcontinental Bus System, Inc., was the "owner" company and the Continental Bus System, Inc., was the "operator" company. The title and ownership of the bus which was involved in the collision was in Transcontinental, and the operation thereof was by Continental as a part of its bus line. The tires on the bus belonged to neither Company. It is at present customary for bus owners or operators to enter into contracts with tire manufacturing companies to supply and maintain tires used thereon on a usage (ordinarily computed on mileage) basis. With reference to the Transcontinental's buses and the contract entered into between Transcontinental and Goodrich the contract was exclusive, and only Goodrich tires were to be used. The contract Transcontinental entered into with Goodrich was negotiated and executed by M. E. Moore, President of Transcontinental. Mr. Moore is also the President of Continental. The tire *lessor* was Goodrich and the *lessee* was Transcontinental. Nowhere in the contract was Continental or its operations mentioned. In so far as the bus in question is concerned, it was a "leased" bus, Transcontinental being the lessor and Continental being the lessee. Continental also owns buses, but its own tire contract is with the Firestone Tire and Rubber Company and is also exclusive. In other words, if Continental owns the bus Firestone supplies and maintains the tires thereon.

Transcontinental's (lessee) contract with Goodrich (lessor) provides that its entire agreement "is personal to Lessee and cannot be transferred without the written consent of Lessor, and none of the terms hereof can be altered, changed or modified, except by a written agreement signed by each party through an executive officer." Provisions of the contract include arrangement whereby the lessee was to furnish to lessor the necessary space in its garages for the suitable repair and servicing of tires furnished under and by reason of the contract. The lessor was to have access to its tires and reasonable time to service them, and to change or repair such of them as it saw fit. Lessee was to deliver all damaged tires to lessor at lessee's garage. Lessee was made liable for tires rendered unfit for service by accident, abuse, fire or other casualty and was obliged to either replace the same with tires satisfactory to lessor or to pay for them at lessor's list prices less the amount of rental previously paid for the use thereof under contractual provisions.

Transcontinental's (lessee) contract with Goodrich (lessor) further provided that "Lessor shall defend, indemnify and save harmless the Lessee from and against any and all claims, actions or threatened actions for damages to property or injuries (including death) to persons arising or growing out of any negligence, fault or default on the part of the Lessor, its servants, agents, employees, or subcontractors."

The state of Continental's pleadings at time the trial began included allegations that the contracting between Transcontinental and Goodrich above described was intended (by Transcontinental) to protect Continental as well as Transcontinental, and that the failure to provide for such was the result of inadvertence or oversight, the intention having been that the provi-

sions and benefits of the contract were to run to the use and protection of all the associated bus companies (in addition to Transcontinental) who used the tires being provided by Goodrich, including Continental. It is to be noted that the pleadings did not allege mutual mistake. It is also to be noted that in the prayer for relief there was no request that the contract be reformed, though the prayer is for "judgment over" (in the full amount which might be awarded the Toombs) under the terms of the contract.

When Continental offered the testimony of Mr. M. E. Moore, President of both Transcontinental and Continental, the proof of the execution of the contract was made and then the question was asked of the witness: "Now in these dealings with these Goodrich people, can you tell us why Continental Bus lines was not named in here with Transcontinental?" Objection was made that the testimony sought to be elicited was in violation of the parol evidence rule. The discussion culminated in the court retiring the jury. Then Goodrich's attorney objected to Continental's attorney stating that provision for indemnity to Continental was left out through inadvertence or mutual mistake on the ground that mutual mistake had not been plead. Continental's attorney offered to file a trial amendment pleading mutual mistake. Then evidence was received from Mr. Moore outside the presence of the jury. His testimony amounted to evidence that he had intended that Continental and its operations be protected by the same indemnity as provided for Transcontinental, if and in the event any fault due to one of Goodrich's tires resulted in injury or damage to some third person, and that he would not have entered into the contract except upon that understanding. He admitted that he did not specifically so inform Goodrich's representatives at or before the time the contract was made. On cross-examination, Mr. Moore admitted that Transcontinental had a general counsel at the time the contract in question was negotiated; that said

general counsel acted in the same capacity for Continental; that the general counsel did not read the contract before it was signed, though he did see a supplement to the contract before the supplement was signed (said supplement not being material to questions here); but that he, Moore, read over the contract before he signed it.

Ruling of the court was then requested and Continental was denied right to file its tendered trial amendment and the objection was sustained to presentation of Moore's testimony in said respects before the jury.

It is evident that Transcontinental's inadvertence or oversight to cause the contract to protect Continental supplies no basis for any relief to the latter Company. It could not be said that Mr. Moore's testimony amounted to proof of any mutual mistake. There could therefore have been no error in the denial of the request to admit a trial amendment to the pleadings setting up mutual mistake. As noted, there was no prayer for any reformation, but this "step" was skipped in the attempt to obtain indemnity to be afforded by judicial decree which would afford relief to Continental if and in the event of any recovery by the Toombs family by reading it into the judgment. Furthermore, the tendered evidence was clearly inhibited under the parol evidence rule. 17 Tex.Jur., p. 838, "Evidence—Civil Cases," sec. 380, "Mistake or Accident."

Other points of error are predicated upon the finding of the jury that Goodrich failed to properly inspect, or cause to be properly inspected, the tire which "blew out" in an inspection made prior to the time the bus left on the trip on which the collision occurred. The question submitted to the jury as to such failure was as of the date of August 15, 1957, after the bus arrived at the Continental garage in Dallas, Texas. This issue was No. 42, and by the answer to Special Issue No. 43, predicated upon an affirmative answer to No. 42, it was found that such failure amounted to a proximate cause of the collision.

Immediately following, in answer to an issue the burden of which was placed upon Goodrich, the jury found that Goodrich, through its employee H. S. Paschall, did make an inspection of the tire in question on August 16, 1957, prior to the collision. Then the jury found that Paschall was acting in the course of his employment in performing the inspection,—and then, in an issue the burden of which was cast upon the Toombs, found that Paschall did not fail to make a proper inspection of said tire on that occasion.

It is evident that the bus on which the tire in question was installed arrived at the bus station in Dallas on August 15, 1957, at some time between 4:10 p. m. and 5:55 p. m. It arrived at the Continental garage in Dallas, where Goodrich had employees, some 20 minutes after the time it arrived at the bus station. The tire was not inspected the day of the bus' arrival in Dallas, but was inspected the following day.

There is evidence in the record to the effect that a tire inspection immediately following a bus' run, while the tire is hot or still warm from the friction of usage, may be more fruitful and revealing of defects therein of certain types than would be the case in an inspection made after the tire had cooled. It is clear from the statement of facts that an issue was made as to the best time for a tire examination in a test to discover whether there has been a tread separation. Several expert witnesses, including those of Goodrich, testified that such a defect in a tire would show up best just after the tire had been run on a vehicle. A reason given therefor was the fact that heat expands air, and that in such a defect the heat trapped between the tread and the carcass of the tire would tend to build the largest "bubble", while the "bubble" would not be as evident once the tire was cool. Further, there was testimony that there would be more friction at the site of such a defect, and therefore more heat would be generated at that point, with an ability to detect the defect through a temperature dif-

ferential as compared with the heat in other parts of the tire.

The evidence in the record reflects that a Mr. Jones, who was a representative of Goodrich, had given Goodrich's employee Paschall instructions not to inspect the tires until they had cooled off. In the instant case, Mr. Paschall did not make his inspection until the tire in question had cooled off, at least overnight.

All this, taken into consideration in connection with the evidence and jury findings, makes it apparent that the fact-finding body, i. e., the jury, was of the opinion that Goodrich was negligent in selecting the time it did select to make its examination of the tire in question, the defect in which was undisputedly caused by the act of Continental.

The trial court, on motion, disregarded the jury's answers to Special Issues finding negligence against Goodrich for failing to inspect on August 15, 1957, the tire which "blew out" on date of August 16. We are of the opinion that such action of the court was proper. Decisions in Texas are to the effect that where there is no contractual obligation upon the matter of liability, a lendor or bailor of a motor vehicle or other machinery, etc., is liable for injuries to third persons growing out of defects which render the same dangerous only if he had knowledge of such defects at the time said vehicle or other machinery, etc., was furnished to his bailee, or if he could have known of such defects by the exercise of proper care. Sturtevant v. Pagel, 1939, 134 Tex. 46, 130 S.W.2d 1017, affirming Tex. Civ.App., 109 S.W.2d 556, which cites cases.

Of course, a tire for use on a bus is the kind of chattel which if defective, and used by another in ignorance of the defect, would not ordinarily be expected to involve grave risk of serious bodily harm or death upon a failure during its use. Rather, such an event would be reasonably expected to do no more than some comparatively minor harm. Therefore, the lendor or bailor of such would not be required to make that minute-

ness of inspection which would be requisite in the case of explosives, etc. We believe that under the circumstances of this case Goodrich would be required only to take cognizance of an apparent defect evident from exterior inspection of the tire not unlike that in the case of the owner or operator of privately owned automobiles. See Restatement of the Law, Torts, p. 1095, "Suppliers of Chattels," sec. 408, "Lease of Chattel for Immediate Use."

Goodrich's obligation relative to the tire was that of a bailor for hire as to Transcontinental, and we believe that in view of Goodrich's evident knowledge of the custom and practice of Transcontinental's bailment in turn to Continental, irrespective of any question of contractual obligation, Goodrich may be considered for the sake of the question sought to be resolved as a bailor for hire to Continental. And, in view of the evidence upon the matter of the inspection practice and procedure of Goodrich as applied to its bailed tires, we should properly treat the tire with which we are concerned as though it was the subject of bailment at time of the conclusion of each inspection thereof made by Goodrich. At least, we may do so under the circumstances of this case.

■ The liability of a bailor to its bailee, as extended to third persons, would include liability in permitting the use of a defective tire when the bailor either actually knew of a defect, or, as a reasonably prudent person he should have discovered the defect. If a reasonable inspection would have disclosed the defective condition of the tire, then Goodrich would be liable under the jury findings to this effect. See 79 A.L.R. 1218, "Condition of tires as affecting liability for automobile accident"; Minneapolis, St. P. & S. S. M. R. Co. v. Washburn Lignite Coal Co., 40 N.D. 69, 168 N.W. 684, 12 A.L.R. 744; Saunders System Birmingham Co. v. Adams, 217 Ala. 621, 117 So. 72, 61 A.L.R. 1336; 131 A.L.R. 845, "Liability of bailor for personal injuries or death due to defects in subject of bailment."

Here, we are of the opinion that Goodrich had no duty to inspect the tire at Dallas on either the 15th or the 16th of August, 1957. It is true that it elected to do so on the 16th. It is also true that under the charge the jury decided as a matter of fact that had Goodrich made an inspection on the 15th when the bus first arrived at Continental's garage it would have discovered the defect, and, upon such discovery, assumed that Goodrich would have acted. But we have concluded that liability could not be predicated upon such fact finding under the law. Failure of a person to do that which he has no obligation to do could not constitute negligence, and liability could not be predicated thereupon. There was no contractual obligation which required action by Goodrich. Indeed, there is no evidence that Goodrich was afforded opportunity to make an inspection before the 16th, though we deem that immaterial. It elected to make an inspection and did make the same on the 16th, and in answers to special issues the jury acquitted it of any negligence attendant thereupon. Even if we were to assume that Goodrich was afforded the opportunity to inspect on the 15th and did not do so, but elected to inspect on the 16th, no benefit would enure to Continental or the Toombs. The fact that the 15th might, in the opinion of third persons, have been a better time for the inspection to have been made would not authorize a finding of negligence because of the selection of a later time for the inspection. The fact that there may have been a safer method than that employed, or that danger might have been avoided by action in a different manner, does not make an act negligent. 65 C.J.S. Negligence § 2, subd. i, Possibility of Safer Method, p. 330.

It follows from what we have said that Continental's and Davis' points of error Nos. 12, 13, and 14 are without merit and therefore overruled. This done, it becomes conclusive that Goodrich was properly relieved of liability by the judgment rendered in the case and that the liability for damages to the Toombs is resolved upon

Continental and its driver, Davis. The remaining points of error to be considered and tested all relate to the matter of the excessiveness of the verdict and judgment rendered against them in the court below. It also follows that the Toombs' cross-assignment of error contending that Goodrich should be held liable to them in damages is likewise without merit and is overruled.

Continental's and Davis' ninth and tenth points relate to the jury argument in regard to damages. It was contended that reversible error occurred because Toombs' counsel did not discuss the damage issues and therefore did not fully open the case, as result of which Continental and Davis were deprived of their right to answer the argument on damages which was made in the closing argument. It was further contended that the argument of Toombs' counsel in closing was improper, inflammatory and prejudicial to the point of reversible error in that he argued that $25 a day would be proper compensation for pain and suffering of Alton Toombs.

At the conclusion of the opening argument by Toombs' attorney, the objection was made that the case had not been fully opened as to argument. The objection was overruled. By Bill of Exception the point was preserved. The bill was approved with qualification by the court reciting a portion of the general argument made in opening. It is noted therefrom that though such argument was brief it was pointed out to the jury that $175,000 damages were being sought on account of Alton Toombs' injuries, $202,058.50 was being sought by Alton Toombs on account of damages he sustained as the result of the death of his wife, $100,000 was being sought by Gary Michael Toombs on account of the damages he sustained as the result of the death of his mother, and $30,000 was being sought by Gwendolyn Toombs Whitson on account of the damages she sustained as the result of the death of her mother. Reference was made to the petition read to the jury at the beginning of the trial, and also to the statements made before the jury panel on voir dire examination. The statement, as follows, was made: "* * * each one was told that this law suit involved a half million dollars and that we intended and expected to prove to you that Alton Toombs and those two children over there were entitled to every dime of it. We put on the evidence of the damages. We showed you what was wrong with these people. We showed you what kind of a mother and wife Wilma Toombs was."

Actually there is no reversible error resultant because a plaintiff fails to open and fully discuss the whole case in the opening argument. The error, if any under the circumstances, would occur when the same plaintiff is permitted to discuss matters in the closing argument which should have been injected when he opened. Dallas Joint Stock Land Bank of Dallas v. Magee, Tex.Civ.App. Waco 1938, 117 S. W.2d 473, affirmed at 134 Tex. 620, 136 S.W.2d 1117. Of course, the conduct of any trial is supposed to be controlled by the judge presiding, and the decision as to whether argument in a suit for damages has been fully opened as to damages must primarily rest within his discretion. Were the state of the case such that any error was to be tested, the question would be whether the judge had abused his discretion in permitting argument to be made during plaintiff's closing argument which was not in reply to the argument of the defendant. Here, there is no such case, and there is no contention that there was any abuse of judicial discretion. An excellent discussion on procedure and rights incident thereto on the question is to be found in McDonald, Texas Civil Practice, Vol. 3, page 1182, "Jury Trial: Argument", sec. 13.03, "Opening Argument."

On the matter of argument relative to an allowance of $25 per day for pain and suffering of Alton Toombs during the course of the closing argument, we believe it advisable to quote the Bill of Exception, as

follows: "Be it remembered that upon the trial of the above cause the following proceedings took place, to wit: Attorney Mock for the plaintiffs made the following argument to the jury over the objection, if any, shown as follows: 'He has never been free of pain. What is it worth in dollars and cents? What would reasonably compensate Alton Toombs for the pain and suffering that he had undergone in the 325 days since the time of the collision? What will it be? You are going to have to answer when you get in there. With pain and suffering like that, would $25.00 a day compensate? I think it would but you— * *

"Mr. Jones: If the court please, the defendants object and except to the attorney * * * testifying about pain and suffering, putting his value on it when it is an item that has no market value and by his testimony in the presence of the jury he is attempting to place through his own self a market value on pain and suffering, an item that has no market value and which is the province of this jury to evaluate. * * *

"The Court: Overrule the objection.' To preserve as a part of the record the foregoing jury argument of Attorney Mock, the Defendants Continental Bus System, Inc. and J. W. Davis present this their Bill of Exception No. 6 and ask that same be approved."

The Bill of Exception was approved, subject to the qualification that the argument complained of was made after all the other elements of damage on account of personal injuries of Alton M. Toombs were discussed, and immediately after an extensive discussion of the medical testimony upon the matter. Further qualification was made to the effect that after the objection was made, Attorney Mock stated to the jury in substance that it could do the figuring as well as he (the attorney) could; that both prior to the argument complained of and afterward Attorney Mock stated that he was not testifying and that the jury must draw its own conclusions from the

evidence as to damages and not from what any attorney said, and that he was merely attempting to assist them by furnishing a method for computation of damages.

■ The contention of error is predicated basically upon the theory that it is improper for any argument to be made to the jury upon the matter of any mathematical calculation of pain and suffering on a per diem or similar basis. Continental and Davis refer to and copy extensively from the majority opinion in the case of Botta v. Brunner, 1958, 26 N.J. 82, 138 A.2d 713, summarized at 60 A.L.R.2d 1331, with opinion copied beginning at page 1335, in which the arguments are marshalled against the permitting of plaintiffs' attorney to argue pain and suffering damages on such a basis. The Toombs' attorneys counter with citation and extensive copying from the Rutgers Law Journal (Spring, 1958 issue, pages 522–526), which strongly criticizes the Botta v. Brunner position. Additionally, cases from jurisdictions refusing to honor the principle adopted in that case are referred to as having been annotated in 60 A.L.R.2d at pages 1331–1353, "Per diem or similar mathematical basis for fixing damages for pain and suffering" (at page 1347). They also copy extensively therefrom, beginning at page 1350.

To abbreviate, we will state that we see nothing improper in arguing a mathematical calculation on the matter of the amount of damages to be awarded for pain and suffering. If it would be error to so argue this phase of a case, it would certainly be error for the jury to use a mathematical calculation in a case where the case was not so argued, but the members of the jury might seize upon the method as a manner in which the damages to be awarded might be calculated. Certainly, any reasoning upon this premise would demonstrate a greater potential harm to have resulted to a defendant in the latter case, for a jury would be at liberty to reject this form of calculation even if made by an attorney while he was arguing plaintiff's case,

and it does not necessarily follow that because an attorney argues for the use of such that the jury before whom the argument was delivered actually acted upon the suggestion. We agree that selection of a total pain and suffering damage figure *en masse* "by guess and by golly" is likely to be lower than a figure calculated by first arriving at an "average per day" damage figure and multiplying it by the number of days established as a period in the evidence. We agree, even, that if no period has been established in the evidence, the jury might be compelled to resort to the "by guess and by golly" method. Nevertheless, the former would seem to be the more reasonable and accurate and more likely to result in a just and proper allowance for this character of damage when the evidence establishes both the period and evidence from which an average daily degree of pain might be inferred, together with a value thereof.

In any event, there is prior Texas authority to the effect that reversible error does not result when this character of argument is made. J. D. Wright & Son Truck Line v. Chandler, Tex.Civ.App., Galveston 1950, 231 S.W.2d 786, writ refused n. r. e.

Continental's and Davis' first and second points relate to complaint of the figure of $85,000 as damages for the personal injuries of Alton Toombs. The jury found this amount, and by refusing to require any remittitur and by entry of judgment thereupon the trial judge refused to concur with the argument that it was excessive.

■ Personal injury damages are unliquidated and not capable of measurement by any certain standard. As to this character of damages a jury has a large discretion in fixing the amount of the award. After a jury has done so, the trial judge may set aside an award which is grossly and manifestly excessive or inadequate, his being the first discretion to be exercised after the jury has acted. The Court of Civil Appeals has the second discretion in such cases and if it concludes that the trial

judge has erred in refusing to hold that the jury has transcended its discretion, then the judgment can be set aside because it is unreasonable. See McCormick on Damages (Hornbrook Series), p. 71, "Review of Amount of Damages," sec. 18, "Where the damage is unliquidated * * *." Of course, where there is an insufficiency of evidence to support an amount in damages, there is not necessarily any abuse of discretion in failing to require a remittitur. In such cases, it may well be that any error is purely that of personal recollection of the evidence.

■ Alton Toombs is a certified public accountant. For several years his earnings and earning capacities showed a steady and substantial annual increase up to the year his injuries were sustained. During the entire year of 1957 he earned a net income of $13,785.64. In 1957 up until the date of his injuries (August 16, 1957), he had earned $11,711.93. Following his injuries, for the first one-half of the year 1958, during which Mr. Toombs was back in business, his net income ran approximately $4,400 less than the preceding year. He was in the Naval Reserve (required service entailing compulsory training cruises), for which he drew annual pay of $1,469.84. At time of his injuries he had a life expectancy of 28.41 years. He had been quite active prior to his injuries, enjoying all kinds of participant sports. The medical and hospital expenses already incurred, plus those anticipated, approached the figure of $5,000.

The injuries Mr. Toombs sustained in the collision included compound fractures of both bones above the ankle in the right leg; crushing fracture of the right knee and kneecap necessitating removal of the kneecap; cuts on the face and head in several places, each requiring sutures; bruising of the left side of the face; bruising and abrasions and cuts on both hands and forearms; shock and concussion rendering him unable to recall the collision in which his injuries were sustained. Of the injuries,

those to the right leg were the most serious. Infection developed therein which required extensive treatment. He was still on crutches at time of the trial, almost a year after the collision. His ankle was swollen. His right leg was permanently shorter than the left. Arthritis was present in the ankle as result of the injuries. There was fifty per cent loss of motion in the ankle and also a loss of motion in the knee. Medical opinion was to the effect that he would be troubled with progressive arthritis in the years to come, at which time it would probably be necessary to fuse the ankle joint. Medical opinion was further to the effect that there would be a permanent condition of loss of use of the ankle and knee and that he would always have swelling in the ankle. In addition, there was evidence that the brain concussion and pain from injuries in general had an effect upon the nerves of Mr. Tooms impairing his ability to concentrate.

Adverting to the issues on negligence and proximate cause, it is to be noticed that while Continental and Davis were convicted of negligence which was proximate cause of the collision in most respects they were at the same time acquitted thereof in other respects. For example, the jury refused to find that there was any failure on the part of Continental and its driver to keep a proper lookout. It likewise refused to find any failure to inspect the tire on the day of the collision. It found that though the tire had been damaged by an employee of Continental by driving it against curbs, rocks, etc., such did not amount to negligence. There is no indication of passion or prejudice on the part of the jury in an analysis of these issues. There was no evidence on motion for new trial which lent any indication or inference that the jury was activated or moved by any passion or prejudice in its consideration of the damage issues.

Counsel for Mr. Toombs calls our attention to the state of the evidence relative to his income from his reserve status with the Navy. There was evidence from which the jury was entitled to draw the inference that Toombs would not be able to meet the requirements of the physical examination forthcoming at time of his next required cruise, and that he therefore would not be permitted to make the same, all to result in his discharge from the Naval service. It is pointed out that upon such occurring the benefits otherwise expected to accrue in a total amount of $34,000 in service and retirement pay would be lost, all due to the injuries. We also note the inferences which were within the province of the jury to be drawn upon the matter of earnings in the future from Mr. Toombs' occupation as a certified public accountant, and the comparison of those which will reasonably be received as compared with how much more might reasonably have been received but for the injuries. In our opinion, the loss reasonably calculable from all this, coupled with the evidence proving very grievous mental and physical pain and suffering from the effects of the injuries, fails to demonstrate that the $85,000 damage figure in itself is indicative of any passion or prejudice on the part of the jury, although it is somewhat liberal. Therefore, we see no reason why we should deem the action of the court below to have constituted an abuse of discretion, or the findings of the jury to have been improperly motivated. The points of error are overruled.

Continental's and Davis' points Nos. 3 to 8, inclusive, relate to complaint of the figures found as damages sustained by the various members of the Toombs family as the result of the death of Wilma Toombs. The jury found damages of $60,000 to Alton Toombs, her husband; $50,000 to Gary Michael Toombs (age 12 years at time of collision), her son; and $10,000 to Gwendolyn Toombs Whitson (age 19 years and single at time of collision), her daughter. The attorney for the Toombs family deemed it very important to point out the character, training and experience of the deceased as a basis for any evaluation to be made of her services to her husband and children. She

was experienced as a stenographer/secretary, including that in the legal field. She was a music graduate of a Conservatory of Fine Arts, and had taught music. She was a good seamstress. She had been a very good student herself, and was disposed to work with her children in connection with their own studies to the extent of averaging two hours each school night. While her husband was doing his apprenticeship as a certified public accountant she had contributed substantially to the family income by teaching music. In 1952 she went to work for her husband as his secretary and receptionist, acting at the same time as receptionist for two other concerns which shared office arrangements with her husband during the time he was getting started. She did this kind of work on a full-time basis until January of 1956, after which time she devoted her labors to the home. It was intended that she would return to the office in the fall of 1957, the year of her death, when her daughter was to enter college. During the period aforesaid, she taught some music, kept house, did the cooking, washing and ironing in the home, and did all the family shopping. She was described as a normal, healthy, intelligent woman who was extremely devoted to her husband and children. She was further described as most efficient in managing her household and conducting the training of her growing children.

The court's charge did not refer to any deduction or credit relative to Alton Toombs' obligation to support and maintain his wife, had she lived, but there is no complaint of the charge on the appeal.

In considering the $60,000 amount awarded to Alton Toombs, the husband, we are of course bound to consider his life expectancy of 28.41 years rather than that of the deceased which was a little longer. In computing the damages of a husband for the death of his wife, the recovery should not be limited to the recovery of the cost of a menial servant. Neither should the recovery be limited to what the wife would have earned working for another, nor to a combination thereof. Rather would these be included along with recovery of the value of her services in counseling, advising, inspiring, comforting and otherwise serving her husband as would have reasonably been expected from a wife who was the kind of person she is shown to have been. Finck Cigar Co. v. Campbell, Tex.Civ.App., Fort Worth 1938, 114 S.W. 2d 348, affirmed at 134 Tex. 250, 133 S.W.2d 759.

In the record of this case we have proof that the woman working in her place, and to which she planned to return when her daughter was in college, was being paid $240 per month. Further proof in the record is to the effect that prevailing wages for female domestic help on a full-time basis in the Wichita Falls area would range between $140 to $200 per month for the performance of household functions commensurate to those she was performing. With the abundance of evidence in demonstration of her willingness and intention to perform both duties in the future as in the past, there is no question but what the assessed damages found ample support in the evidence, even without consideration of those certain important intangibles commented upon in the case of Finck Cigar Co. v. Campbell, supra. It is further to be noted that nothing is found in the record which points to any passion or prejudice on the part of the jury aside from a consideration of the amount of damages found by the jury upon evidence. Fabrizi v. Griffin, D.C.Pa.1958, 162 F.Supp. 276, affirmed Fabrizi v. Kramer Bros. Freight Lines, 3 Cir., 261 F.2d 594.

In considering the $50,000 amount found as damages sustained by Gary Michael Toombs, the son, we are confronted with damages more intangible than in the case of the deceased's husband.

From the evidence it is apparent that the son had been a "puny" youngster since his birth, and that he is an asthmatic. His

mother was required to render greater service to him during the younger years of his life for these reasons than in the case of a normal and healthy youngster. By the time the boy had reached the age of nine years, the care and watchfulness of the mother had resulted in keeping asthmatic attacks warded off. However, beginning shortly after the time of his mother's death the boy experienced a recurrence of the attacks and had at least three such of severity sufficient to keep him out of school. In view of his mother's death, his older sister abandoned her plans to go to college in the fall of 1957 and remained at home and rendered some care of the boy (who was 12 years of age at time of the mother's death). After the marriage of the sister not long before the time of the trial, the boy lived alone with his father, the two of them eating a good many meals out. His school grades fell somewhat after the death of his mother, but there is no evidence that they were lowered into the failing level.

Though the evidence permits the inference that the boy did actually sustain a greater loss as the result of the death of his mother than would have been the case as applied to a wholly normal boy of the same age in good health, we are of the opinion that damages allowed him in the sum of $50,000 are excessive. From analysis of the entire record, we do not believe that the jury was motivated by any passion or prejudice, or other improper motive in arriving at the figure. Rather, we are of the opinion that the evidence does not support the finding of the jury and the judgment entered thereon to the extent of $50,-000 damages. The boy had reached the age where his future development would be controlled in great degree by his father even were his mother still present and rendering service. It is true that his background, like unto that of his parents, was such that it would be reasonable to believe that he would be a person who would seek higher education, perhaps extending even into professional lines. This, however, would largely be a matter where the financial assistance would control over the moral and spiritual guidance in which the influence of his mother would have been most consequential. His father is still alive and performing the primary function of "breadwinner" for the family.

While we cannot assume that the jury did so, we strongly suspect that it took into consideration the very considerable amount of care that Gary Michael Toombs had already received from his mother during his formative years as well as the elements to which it was confined by the instructions of the court. In any event, we have reached the conclusion that the amount found in the verdict was excessive by the amount of $20,000, and that the judgment, in so far as it was entered upon the issue fixing the damages sustained by the son at $50,000, was excessive by the amount of $20,000. It follows that the trial court should have required a remittitur in such amount as predicate to entry of judgment in behalf of Gary Michael Toombs. See Complete Auto Transit v. Floyd, 5 Cir., 1957, 249 F.2d 396, certiorari denied 356 U.S. 949, 78 S. Ct. 913, 2 L.Ed.2d 843. See also Union Transports, Inc. v. Braun, Tex.Civ.App., Eastland 1958, 318 S.W.2d 927, writ history not yet available.

Though there is no assignment on the sufficiency of the evidence, we believe that point of error No. 6 does encompass such to the extent of necessity in the consideration of the question of remittitur. Therefore, the contention therein that the court erred "in refusing to require a remittitur of a substantial amount" should be sustained. When we arrive at the conclusion that the maximum damages supported by the record is $30,000, we are obliged to treat any amount above this as excess. Wichita Valley Ry. Co. v. Williams, Tex.Com.App. 1926, 116 Tex. 253, 269, 288 S.W. 425, 430, answering certified questions.

In considering the $10,000 awarded to the deceased's daughter, Gwendolyn Toombs Whitson, the same rules apply as

in the case of Gary Michael Toombs. As previously indicated, we observe nothing in the record to support the contention that the amounts found were indicative of improper motive on the part of the jury. The daughter gave up her plans to go to college following the death of her mother and rendered help in caring for her young brother and injured father. She did attempt to attend a local college but quit after one semester. She went to work in the local television station, met John Whitson, and married him in April, 1958. At the time of the trial she was expecting her first child. She was nineteen years of age at time of her mother's death, and was at a point with her mother's guidance where she was entering into young womanhood with the brightest of educational prospects. With the abrupt ending of her mother's service and guidance, it might reasonably be · concluded that the future which was planned by and for the daughter collapsed. At least, the jury was warranted in drawing such an inference from the evidence. In view of this, and taking into consideration the loss reasonably inferred to the daughter in future years during and after the period in which she would be bearing and rearing her own children, we see nothing to demonstrate that the amount of $10,000 damages awarded to her was excessive. Union Transports, Inc. v. Braun, supra.

From what we have said, it is apparent that the judgment below is to be affirmed in all respects except as to Gary Michael Toombs. Judgment in favor of Gary Michael Toombs is reversed and remanded for another trial, subject to an affirmance on condition that he, or his next friend or the guardian of his estate acting for him, file a remittitur of $20,000 within fifteen days from the date hereof.

## Supplemental Opinion.

On April 24, 1959, we indicated by an opinion in writing that if appellee Gary Michael Toombs, or his next friend or the guardian of his estate for him, would file a remittitur of $20,000 within fifteen days thereof, the judgment of the trial court would be affirmed; otherwise, the judgment of the trial court in favor of said appellee would be reversed and the cause (as to him) remanded.

A motion for rehearing was filed in behalf of said appellee as part and parcel of the motion for rehearing by all the appellees who were plaintiffs below. Subject thereto, there has been filed in behalf of the said appellee Gary Michael Toombs, a minor, a remittitur of $20,000. Such action was taken by Alton M. Toombs, acting in the capacity of both the next friend and as Temporary Guardian of the Estate of said minor. Letters of temporary guardianship were furnished this Court along with copy of order of the County Court of Wichita County, Texas, empowering the Temporary Guardian to execute the remittitur.

Accordingly, as of this date, the motion for rehearing of the appellee Gary Michael Toombs is overruled and the judgment of the trial court is reformed by deducting the amount of $20,000 from the judgment recovered by said appellee, and, as so reformed, is affirmed.

Further motions for rehearing may be filed by appellee Gary Michael Toombs, appellee B. F. Goodrich Company, and the appellants in said cause, as applied to the judgment to the extent it is amended pursuant hereto, within fifteen days after this date.