BOOP, APPELLEE, *v.* THE BALTIMORE & OHIO RAILROAD CO., APPELLANT.

(No. 1231—Decided May 21, 1963.)

*Messrs. Spangenberg, Hasenflue & Shibley* and *Messrs. Navarre, Rizor, DaPore & Pettit,* for appellee.

*Messrs. Shumaker, Loop & Kendrick* and *Messrs. Bentley, Cory, Boesel & Leonard,* for appellant.

GUERNSEY, J.  This is an appeal on questions of law from a judgment of the Common Pleas Court of Allen County in an action brought by the plaintiff, Burlin R. Boop, alleging the liability to him of defendant, The Baltimore & Ohio Railroad Company, under the provisions of both the Federal Employers' Liability Act (Section 51, Title 45, U. S. Code) and the Federal Safety Appliance Act (Section 1, Title 45, U. S. Code), for in-

juries received by Boop while working as a car inspector in defendant's yard.

The action was tried to a jury and pursuant to special verdicts the trial court entered a judgment against the railroad in the amount of $372,452, found to be the amount which would fully compensate Boop for his injuries. It is from that judgment that the railroad has perfected its appeal.

With respect to appellant's assignments of error the following appears in the railroad's brief:

"Defendant assigns as error material and prejudicial to its substantial rights the action of the trial court in overruling its motion to vacate and set aside the judgment and for a new trial, which it submits should have been granted for the following reasons:

"1. The special verdict of the jury and the judgment of the court are grossly excessive, resulting from passion or prejudice on the part of the jury.

"2. Counsel for the plaintiff was guilty of misconduct in argument to the jury.

"3. The special verdict of the jury and the judgment of the court are grossly excessive and not sustained by sufficient evidence.

"4. Error in the form and substance of the special verdict submitted to the jury by the court and in the court's charge to the jury.

"5. Error of the court in refusing to give to the jury in advance of argument Special Requests to Charge Nos. 1, 2, 3 and 10 tendered by the defendant.

"* * *

"Defendant also assigns as error material and prejudicial to its substantial rights the action of the trial court in overruling its motions for a directed verdict and for judgment notwithstanding the special verdict of the jury and the judgment entered thereon.

"While our principal emphasis in this appeal will be directed to the errors relating to the right of the defendant to a new trial, our position throughout the litigation has been and is now that defendant is entitled to judgment in its favor as a matter of law for the reason that plaintiff's violation of the 'Blue Flag Rule,' a specific safety rule promulgated for the

protection of employees and to prevent just such an accident as occurred here, * * *, constituted the sole proximate cause of the accident and plaintiff's injuries and damages. * * *.''

It will be observed that the railroad makes no claim as to whether the evidence supports the special verdicts of the jury pertaining to liability, as contrasted with damages, except its claim that the evidence shows the plaintiff's violation of the "blue flag rule" to be the sole proximate cause of his injuries. We have carefully considered this claim and find that there was sufficient and substantial evidence of probative value to support the conclusion, which must be drawn from the special verdicts, that plaintiff's violation was not the sole proximate cause of his injuries, and we therefore find the railroad's claim in this respect without merit.

Although Boop sets forth in detail in his brief the evidence which he claims supports the special verdicts of the jury as to liability under both the Federal Employers' Liability Act and the Federal Safety Appliance Act, since the railroad has neither assigned, claimed nor argued the insufficiency of such evidence, except in the manner referred to in the preceding paragraph, we will exercise the prerogative bestowed upon us by Section 2505.21, Revised Code, and disregard any further supposed issue as to the sufficiency of the evidence to support the determinations of fact upon which liability rests.

We have carefully read all 1,170 pages of the trial record, perused or examined each of the exhibits admitted to the record, and have considered and find all the railroad's other claims and assignments of error without merit, with the possible exception of those claims contained in the quoted subparagraphs numbered 1, 2, and 3, *supra*, which claims of error we will consider together.

The railroad's claim that the verdict is excessive as a result of passion and prejudice due to the alleged misconduct of Boop's attorney is based primarily on the last paragraphs of his final argument to the jury where he said:

"* * * If any of you says that is too much, just imagine this: imagine Alladin's lamp in your hand. You rub it and the Genie enters. Genie says, 'What do you want?' 'Well, I want $536,402.00'—or maybe only three hundred thousand, four hundred or maybe somewhere in between—'four hundred and

fifty'—Genie says, 'That is easily done. In fact, Genies have such bank accounts, I can write a check right now,' and puts it down, and says, 'It is yours,' but as you reach for it, he says, 'Just a moment, friend, when you touch that check and make it yours, out of the night fifty tons of steel will come in on you and throw you down upon a rail and the wheel will catch your pants and you will see it come, and you will fight to not be injured, you will throw yourself away from it, but you can't because the wheel is between—pulling you down by the pants until it rides up on your bones and you can hear them splinter and crack, and then it will stop. The wheel in your belly, so you can't breathe until they tear your clothing loose at the chest, and you will be in agony like you never knew before, to the point where finally they say, we are going to move a little and couple in'—think when you do, 'I'll die. I'll die but I don't care.' Go through the long agony this man went through in the hospital; penis, testicles swollen like a football, dead meat rotting on his side, washed away with laundry bleach; operation after skin-graft operation, and finally he becomes the greatest triumph a doctor can have: a man that survived. Of course, Dr. Jones will be proud of that, we say, to survive at all. The Genie then says, 'Some day you will be sitting in your yard, want to play ball with your kid, and you find that is something you still can do, sitting in a chair, for a little while, tossing it, and you will know the humiliation pointed right at you, and say ''look at that man, hasn't any leg.'' ' If the Genie could describe to you what this man has gone through, would any one of you pick up the check? Would you really? You say no to that and any verdict you write is not going to change it.

''Burley, I have done all I can for you. It is up to this jury to tell the B. & O. Railroad whether or not human life is cheap in Allen County.''

This type of argument, where the jurors are asked to put themselves in the place of plaintiff, is commonly known as the ''Golden Rule Argument'' and, upon objection being made, is normally considered objectionable and incompetent for the reason that it constitutes an appeal to the jury to abandon their position of impartiality and to exercise their discretion in the guise of an interested party.

The railroad has also pointed out other statements of

plaintiff's counsel appearing in other portions of his summation to the jury, which it also claims are appeals to the passions and prejudices of the jurors. However, the railroad made no objection at the time thereof either as to the "Golden Rule" argument or as to the other alleged improper statements in order that the trial court would have opportunity to rule upon same and thus reserve the objection for consideration upon appeal.

As a general rule to preserve a question of this character for appeal counsel must make objection at the time the alleged error occurs and may not sit idly by until judgment has been rendered against his client and then for the first time raise his objection. This general rule is also normally applicable to claimed misconduct of counsel in the presence of the jury. 3 Ohio Jurisprudence (2d), 78, Appellate Review, Section 213. Although we must recognize that in an appropriate case "it is a duty of the trial court which is not merely discretionary, when counsel grossly abuses his privilege to the manifest prejudice of the opposite party, to interpose and admonish the offending counsel and to instruct the jury in regard thereto; and if it fail to do so, it is ground for a new trial" (*Hayes* v. *Smith,* 62 Ohio St., 161), we do not find that this is such a case. Many of the statements of counsel were descriptively colorful summations of facts in evidence and entirely permissible. Without condoning other statements of a less factual nature and without condoning the "Golden Rule" argument we do not, however, conclude that counsel grossly abused his privilege *and* that these statements were made to the manifest prejudice of the railroad so as to require the trial court to act without objection being made by the railroad.

We, therefore, conclude that defendant railroad has failed to show any gross abuse of privilege by counsel to the manifest prejudice of defendant, with respect to alleged improper conduct of plaintiff's counsel in appealing to the passions and prejudices of the jurors, which may be considered and determined by this court on this appeal.

The railroad's next claim of error may be summarized that the verdict of the jury was excessive in not being sustained by sufficient evidence and that such excessiveness was a result of improper argument of counsel, not constituting an appeal to passion and prejudice.

This claim of improper argument relates to the argument plaintiff's counsel made with reference to all the elements of damage claimed due plaintiff other than for past medical and hospital expense, loss of wages to time of trial, and future loss of wages. There were stipulations and evidence submitted by Boop and a summary in argument by Boop's attorney whereby the jury could have reasonably concluded that Boop should be compensated in the total amount of $91,402 for these latter elements of damage. The railroad's attorney makes no specific claim of excessiveness as to these items and for the purpose of this appeal we will consider these amounts either as being not against the weight of the evidence or as being conceded. Reducing the verdict and judgment of $372,452 by $91,402 leaves a balance of $281,050 assessed by the jury, and included in the judgment, for all other elements of damage for which no specific evidence as to value was offered or reasonably could be offered. Considering the claims of plaintiff, the evidence, the final arguments and the charge of the court, it is reasonable to conclude that this total of $281,050 included, in addition to damages for pain and suffering in the literal sense, damages, as the trial court phrased it, for the deprivation ''of the normal pleasures of life, the natural enjoyment of the marital relationship with his wife, and the freedom to pursue his recreational interests,'' as well as ''the money value of the loss, if any, of his ability and capacity to do the usual maintenance and repair work about his home.'' These are elements of damage which have only a borderline relationship, if any, to pain and suffering, but as the plaintiff's attorney considered them together with pain and suffering and, in summary, put a single price tag on all elements of damage other than for the past medical and hospital expense, and loss of past and future wages, we will, for the purposes of disposing of the claim of error now considered, consider the entire sum of $281,050 as being attributable to damage for pain and suffering, as used in this broad sense.

The railroad contends that plaintiff's attorney was guilty of ''misconduct'' in his argument and appeal to the jury for damages for pain and suffering. The word, ''misconduct,'' connotes ''intentional wrongdoing: deliberate violation of a rule of law or standard of behavior.'' Webster's New Interna-

tional Dictionary (Third Ed.), Unabridged. As the rule of law which the railroad claims was violated has not previously been established in this Appellate District we cannot, on the circumstances of this case, say that the attorney was guilty of intentional wrongdoing, but instead must determine whether what he did, regardless of his intent, constituted improper and prejudicially erroneous argument to the jury.

The argument of which complaint is made, after a lengthy summary of Boop's pain and suffering (including the borderline items hereinbefore discussed), began:

"Now, what is that kind of misery worth? I tell you how I would arrive at it. If you think that working for wages isn't very great misery but actually has some rewards in satisfaction, in that you feel good about it, just consider the fact that this man felt good about it, too, and got paid $2.50 an hour for doing it. For one quarter of the time of the year, and since every hour that he now has is as hopeless and bleak and dejected as you have seen written in his face as you see now, say, well, just, fair compensation would be $2.50 an hour for all the hours———"

*(At this point counsel for the railroad objected and, the objection being overruled, took a standing objection.)*

"Well, this figure I have calculated comes to something like 21,000 a year, but it comes out in odd figures, and I would round that off. Say the loss of pleasures, of life itself—the loss of my being, because this is no longer Burlin Boop, somebody else and he knows it and he feels it and you must know it—the loss of sexual relations. * * * That is a right he had. A right he enjoyed and a right that has been taken from him, and that is part of the value, too. So, I say, if you figure full damages just for this misery and I don't think $20,000 a year is too much and I hope you don't you will weigh all of these elements the court gives you and come to some figure like that. Say, well, that is a lot of money, my goodness, you would have to be a junior executive in a big company to make that, even a vice president in charge of something, but there has been a lot taken away; because there has been so much taken away, it is going to take a great deal to put it back. Now what does that cost?

"Well, here you run into the problem of future value with-

out being quite sure how long the future is. All we can tell you here is what the actuary told you, the average man of his age would live to seventy-five, at fifty [age at time of trial] he will live 24.78 years, but he might live longer and he might live shorter, and you have a problem for Burlin Boop to write a verdict that will last as long as he lives, because he is going to be in this torment as long as he lives. * * *.

" * * * Now, we are told it costs eighteen-five for payment at the end of the year, nineteen-five for payment tomorrow, for payment in the middle of the year, nineteen thousand dollars even. That is what it really costs to assure yourself, if you are fifty a life income of $20,000 a year, and if you say, members of the jury, we think he should get $20,000 a year, then you should return as full compensation twenty times that unit, and twenty times nineteen as I figure it is 380. That means for future pain already discounted, $380,000, which will produce an annuity of $20,000 a year, but if that figure is fair, then for the two years and three-quarters he has already lived that kind of a life would be $55,000 already paid for in tears, and I would suggest, too, a sum adequate to pay for the worst of the night, hour, any creature could suffer, a night of pain so awful that when you look up and see an undertaker and don't know he is the ambulance driver, you say, almost with happiness, 'Is that you, Russell, did you come for me?,' and those figures, every one of them added together, come to $536,402.00."

Plaintiff's attorney then continued with computations based on a reduction of future wages to $60,000, pain and suffering at $10,000 per year, with $5,000 for the night of the injury and concluded:

" * * * You know what that would come to? $300,404.00. Now, where you go in that range, I think is up to you. If you are going to give this man justice, if you are going to give justice to this community to set a value of all that is really precious and good and wonderful in life, I don't think it can be less than $300,000 when you answer that question, what is full compensation. It can't be more than $536,000, either. You work at it with your minds."

This argument is commonly known as the mathematical formula argument, a type of argument relatively modern in origin, which lends itself to two methods of use, either starting

with a small unit of time related to pain and suffering, giving that unit a seemingly small monetary value, and then by mathematical computation arriving at a product representing the total value of the pain and suffering for the entire period of time for which it might be endured, or, by first assuming a total figure for pain and suffering and then showing by mathematical computation that the average monetary value for pain and suffering of a second, minute, hour or day of the total period is seemingly very small.

So far as counsel has advised us and we have been able to determine this case is one of first impression in Ohio as to the propriety of this type of argument with relation to pain and suffering, except for the case of *Hall* v. *Booth,* 178 N. E. (2d), 619, decided by the Court of Appeals of the First Appellate District, on December 11, 1961, wherein the court disapproved of the argument *without finding same erroneous* and held that ''regardless of the propriety of the 'mathematical formula argument,' the record discloses in this case that the use of the 'mathematical formula argument' did not result in prejudicial error to the appellant; that there is substantial evidence to sustain the verdict of the jury and that substantial justice between the parties has been done.'' The judgment in *Hall* v. *Booth* was, therefore, obviously based on the provisions of Section 2309.59, Revised Code, prohibiting a reviewing court from reversing a judgment by reason of any error in the proceedings, which does not affect the substantial rights of the adverse party. *Hall* v. *Booth* is, therefore, not conclusive in any way in its application to the mathematical formula argument.

Although the railroad claims that the mathematical formula argument made by Boop's attorney was implemented, as is the usual case, by the use of a blackboard and large sheets of paper mounted on an easel, this implementation does not specifically appear in our record on appeal, so our consideration shall be confined to the propriety of the argument alone without reference to such implementation.

The plaintiff cites in his brief, in support of the propriety of his argument, a number of cases from other jurisdictions, including *Pennsylvania Rd. Co.* v. *McKinley* (C. C. A. 6—1961), 288 F. (2d), 262, and cases cited therein. We have carefully ex-

amined each of these cases to determine particularly its validity as authority for the propriety of the mathematical formula argument.

In the *McKinley case* the railroad sought reversal of a Federal Employers' Liability Act judgment entered upon a jury verdict in the amount of $150,000. Although much was said by the court as to the propriety, or impropriety, of the argument, the essence of the opinion in this regard is as follows at page 267:

"Briefs of counsel suggest that in our decision of the instant appeal we must choose between the so-called Botta rule and those authorities which appear to approve what was done by plaintiff's counsel in this case. It is urged that from this choice we must fashion and adopt for this court a rule of practice that will control trials that follow our decision here. We decline to do so. Although defendant's motion for a new trial averred that the verdict was excessive, no such claim is made on this appeal. We, therefore, find it unnecessary to announce a procedural blueprint to be followed in all future trials. * * * " * * *.

" * * *. We will not reverse the judgment entered because of the style and content of counsel's argument."

In *Missouri-Kansas-Texas Rd. Co.* v. *Jones* (Okla., 1960), 354 P. (2d), 415, the action was for $100,543.51 and the jury's verdict was for $39,000. There was no claim or showing on appeal that the verdict was excessive, and the Supreme Court of Oklahoma concluded:

" * * * *if* such conduct of counsel was error, it was harmless, under the circumstances of this case." (Emphasis added.)

In *Yates* v. *Wenk* (1961), 363 Mich., 311, 109 N. W. (2d), 828, the plaintiff had received a whiplash injury, was suffering "almost continuous neck and head pains," was $5,000 out of pocket by reason of the injury, and recovered a judgment of $18,000. Excessiveness of the verdict was neither claimed nor found. Citing one of its previous decisions, where it held that error could be reserved on appeal only by objection timely made in the trial court, the Supreme Court of Michigan, in affirming the judgment, among other things, said, at page 318:

"In addition, if more be needed, the trial and appellate courts have ample means to restrain excessiveness in verdicts.

" " * * *

"A lawyer's attempt in his jury argument to evaluate pain on a daily basis for purposes of illustration, we deem no more objectionable than his attempt to place a monetary value on the total pain and suffering experienced.

"The defendant made no objection during or after the plaintiff's closing argument, but now claims that it was so objectionable (on this and another ground) that the trial judge could not have corrected the harm done even if timely objection had been made."

The case of *Jimmy's Cab, Inc.,* v. *Isennock* (1961), 225 Md., 1, 109 A. (2d), 425, involved only "the propriety of counsel mentioning the *ad damnum* in this opening statement," and did not involve the propriety of the mathematical formula argument.

Several cases were cited from Texas, all in the Court of Civil Appeals, beginning with the case of *J. D. Wright & Son Truck Line* v. *Chandler* (1950), 231 S. W. (2d), 786, wherein the nature of the injuries does not appear, and the extent of the decision is apparent from two headnotes:

"6. *Where no objection was made* at the time of allegedly improper argument to jury appealing to jurors to allow damages at rate of $2 per day for pain and suffering, and *it appeared that such argument was comment on testimony heard by jury* and that jury was in position to pass upon credibility of witnesses and testimony adduced, there was no error." (Emphasis added.)

"8. Award of $20,000 for injuries to plaintiff's wife sustained in automobile collision resulting from negligent operation of defendant's truck * * * was not grossly excessive."

In *Kimbell* v. *Noel* (Texas Court of Civil Appeals, 1950), 228 S. W. (2d), 980, the only related issue was the propriety of the use of a blackboard, and it does not appear that the use of a mathematical formula argument was either involved or considered by the court, nor did the Texas court find the verdict excessive, it being less than one-half of the minimum recovery sought by counsel. In *Continental Bus System, Inc.,* v. *Toombs* (Texas Court of Civil Appeals, 1959), 325 S. W. (2d), 153, where excessive damages were claimed, the Texas court, at page 165 of its opinion, on the authority of the *J. D. Wright*

*case, supra,* approved a mathematical formula argument *"when the evidence establishes both the period and evidence from which an average daily degree of pain might be inferred, together with a value thereof."* (Emphasis added.)

In the latest Texas case cited, *Texas & New Orleans Rd. Co.* v. *Flowers* (Texas Court of Civil Appeals, 1960), 336 S. W. (2d), 907, a jury award had been made of $157,400 to a 21-year-old common laborer who was making $80 per week, had a life expectancy of 43 years, and had suffered injuries requiring amputation of both legs below the knees and amputation of his right arm below the elbow, and who sustained a broken pelvis bone, collar bone and wrist bone and a punctured lung. The court concluded that the award was not excessive and said, as to the mathematical formula argument of the attorney, at page 917:

"* * * We believe that case [*Warren Petroleum Corp.* v. *Pyratt* (Tex. Civ. App.), 275 S. W. (2d), 216] is not controlling as the jury in the present case undoubtedly considered Mr. Peterson's figures as mere argument or suggestion and not as evidence in the case. We think this is made clear in the latter part of the succeeding paragraph [where court computed that the jury awarded only $13,337.50 for pain and mental suffering]."

In *Goldstein* v. *Fendelman* (Mo., 1960), 336 S. W. (2d), 661, plaintiff's counsel wrote on a large cardboard his claims as to the *total* worth of particular injuries and argued these amounts to the jury. No mathematical formula argument was involved and the court said, at page 667:

"While we agree with *Faught* v. *Washam*, Mo. Sup., 329 S. W. (2d), 588, cited by defendant, that it is improper to invite the jury to admeasure damages for pain on a mathematical formula, plaintiff's counsel herein did not make the job offer argument condemned therein, nor commit the other improprieties held therein to constitute reversible error in their totality. Furthermore, in *Faught* v. *Washam, supra,* * * * there was a verdict which the court said 'was not supported by the fragmentary and meager medical evidence in the record.' We have held that not to be true in this case and on that basis hold the argument not prejudicially erroneous in this case. * * *"

The case of *Bowers* v. *Pennsylvania Rd. Co.* (C. C. A. 3—1960), 281 F. (2d), 953, is certainly not a holding, as claimed by plaintiff, that in the interest of uniformity of practice in Federal

Employers' Liability Act cases the per diem argument could be made, for the Circuit Court of Appeals said:

"* * * Defendant's complaint of plaintiff's counsel's argument concerning pecuniary reimbursement for pain and suffering was carefully and correctly discussed by the trial judge. * * *"

And the trial judge in his opinion said at page 759 (of 182 Fed. Supp., 756):

"* * * No federal decisions have been cited bearing directly on this point in cases arising under federal law. A motion for new trial is normally subject to the discretion of the trial judge. To grant a new trial under the theory of the cases just cited [*Botta case*, etc.] would not only result in my establishing an important question of policy [sic] heretofore not considered by my own or any other Circuit but also in surrendering any discretion which a trial judge normally exercises over such a motion. To deny a new trial would result, as it normally should, in forcing the loser below to assume the burden of the appeal, a particularly proper result here where the verdict was not only fair but also clearly supported by the evidence both as to liability as well as damages. * * *"

In *Haycock* v. *Christie* (C. C. A., D. C., 1957), 249 F. (2d), 501, it does not appear that a mathematical formula was either considered or involved, the court merely discussing the use of a blackboard in exhibiting to the jury items and amounts of damages. The original verdict of the jury was $25,000, and the defendant appealed after the trial court had ordered a $17,500 remittitur which was accepted by the plaintiff. In affirming the action of the trial court, the Circuit Court of Appeals cited at page 502 (of 249 F. [2d]) the following from *Hulett* v. *Brinson*, 97 U. S. App., D. C., 139, 229 F. (2d), 22 at page 25:

"It appears clear that the rule in the federal courts is that an appellate court may reverse, if at all, for excessiveness of verdict only where the verdict is so grossly excessive or monstrous as to demonstrate clearly that the trial court has abused its discretion in permitting it to stand."

In *Kindler* v. *Edwards* (1955), 126 Ind. App., 261, 130 N. E. (2d), 491, it appears that the sole question involved was the use of a blackboard and that the mathematical formula argument was neither considered nor involved.

The decision of the Supreme Court of Mississippi in *Four-*

*County Electric Power Assn.* v. *Clardy* (1954), 221 Miss., 403, 73 So. (2d), 144, is characterized by the following headnotes in 73 So. (2d):

"7. Award, in electric burn case, of $75,000 to 22 year old man with a life expectancy of 41 years who sustained severe burns to head and wrist, destroying scalp and part of cranium and crippling hand, who had experienced and continued to experience severe pain and headaches, who was submitted to dizziness, vertigo, epilepsy, sexual impotency, cataracts, arthritis, loss of sleep, and injury to personality, whose amortized loss of earnings was $58,103.70 and whose medical expenses, past and expected, were over $13,000, was not excessive."

"9. That plaintiff's attorneys * * * were allowed to use, in opening statements and in arguments, a chart which itemized the damages claimed, all items finding support in evidence except claim for $5 per day for pain, suffering, and mental anguish, and which was turned away from jury during trial, was not reversible error."

It will be observed that the award for pain and suffering was less than $4,000.

An interesting case said to place Florida alongside other states approving the mathematical formula argument is *Seaboard Airline Rd. Co.* v. *Braddock* (Fla., 1957), 96 So. (2d), 127, involving two suits, one on behalf of an 8½ year old child for the amputation of his leg due to a railroad crossing accident, wherein the jury originally awarded $248,439 damages, and the other by the father of the child for loss of services and medical expenses with a verdict of $6,500. Only the dissenting opinion appears in 96 So. (2d), and there is no opinion of the majority in affirming the judgment of the trial court. However, upon reference to an earlier decision in both cases, *Braddock* v. *Seaboard Airline Rd. Co.*, 80 So. (2d), 662, it appears that the Supreme Court had, in the boy's case, ordered the trial court to enter a remittitur of $61,028 and enter final judgment for the boy in the reduced amount of $187,411, and to enter final judgment, without remittitur, of $6,500 in the father's case. It is the latter judgments and not the original judgments which were thus affirmed in 96 So. (2d). The dissenting opinion explores the question of duplication of damage items on a blackboard used in trial to the jury. Although the blackboard shows use

of mathematical formulae in arriving at the figures thereon it appears in 80 So. (2d) that objection was not made to the use of such formulae and that same was not considered on either appeal by the Supreme Court of Florida. Indeed the Supreme Court says at page 668 of its opinion (80 So. [2d]) :

"The rule does not seek to instruct the jury in the process by which they shall determine the amount of damages for pain and suffering. Jurors know the nature of pain embarrassment and inconvenience, and they also know the nature of money. Their problem of equating the two to afford reasonable and just compensation calls for a high order of human judgment, and the law has provided no better yardstick for their guidance than their enlightened conscience. *Their problem is not one of mathematical calculation* but involves an exercise of their sound judgment of what is fair and right. The problem is often further complicated by the fact that the pain and suffering are yet to be suffered and thus even further removed from exact calculation and certain measurement. But such further uncertainty does not change the problem *from one of judgment to one of calculation.* It still rests within the enlightened conscience of the jury. * * *.

"In this connection [remittitur ordered by trial court or new trial in alternative] we are constrained to note, however, that the trial court was in all likelihood strongly persuaded by the unusual fact in this case that it conclusively appears that the total figure for future pain, suffering and inconveniences was arrived at by an assessment of five dollars per day for the duration of plaintiff's expectancy. The method of counsel's argument to the jury by which the damages are broken down into per diem assessment *was neither challenged nor disapproved in the court below, and we are not required to pass upon it here.* * * *.'' (Emphasis added.)

There then followed in Florida in 1959 one of the most cited cases in this field, decided by the Third District Court of Appeals, *Ratner* v. *Arrington*, 111 So. (2d), 82, in which neither appear the nature and extent of the plaintiff's injuries nor any claim that the verdict was excessive. The court, specifically taking judicial notice of a custom in Dade County of some years standing to use per diem arguments, held at page 89 :

"True, the latter point [mathematical formula argument]

is one which presently is giving courts much concern. Recent holdings, for and against the allowance of such arguments, are not grounded on reasons of sufficient force to compel the decision either way. The ultimate course of judicial opinion on the point is not yet discernible. Therefore, in approving the practice now we do not purport to foreclose the question. We do, however, now hold that the trial judge did not abuse his discretion in overruling appellants' objections to the use of the chart and the argument of appellee's counsel based on the chart.''

In the case of *Aetna Oil Co.* v. *Metcalf* (C. A., 1944), 298 Ky., 706, 183 S. W. (2d), 637, the court reversed the judgment of the trial court by reason of its refusal to permit plaintiff's counsel to argue the amount of damages to the jury. The mathematical formula argument was in no manner involved nor considered.

In *Flaherty* v. *Minneapolis & St. Louis Ry. Co.* (1958), 251 Minn., 345, 87 N. W. (2d), 633, since a new trial had been granted by it on other grounds, the court did not decide the issue of the propriety of a mathematical formula argument but observed its holding in the case of *Boutang* v. *Twin City Motor Bus Co.* (1957), 248 Minn., 240, 80 N. W. (2d), 30, where it held a verdict of $26,500 not excessive and said:

''* * * Appellants predicate error apparently under our holdings in *Ahlstrom* v. *Minneapolis, St. P. & S. S. M. R. Co.*, 244 Minn., 1, 68 N. W. (2d), 873, and *Hallada* v. *Great Northern Ry.*, 244 Minn., 81, 69 N. W. (2d), 673. In neither the *Ahlstrom* nor the *Hallada case* did we hold that the mathematical formula may not be used for purely illustrative purposes. In the *Hallada case* we merely held that the segmentation process of breaking the damage picture into fragments and then applying to each fragment a mathematical formula whereby damages are calculated at a fixed rate per day for the entire period of the injured person's life expectancy, though illuminating, *may be misleading and therefore may not be used as a yardstick for determining the reasonableness of the amount awarded for damages.* This rule does not bar the use of the mathematical formula for purely illustrative purposes.'' (Emphasis added.)

Two Alabama cases, *Clark* v. *Hudson* (1957), 265 Ala., 630, 93 So. (2d), 138, and *McLaney* v. *Turner* (1958), 267 Ala., 588,

104 So. (2d), 315, are cited as placing Alabama in the column in favor of the mathematical formula argument. However, in each of those cases a verdict was affirmed as not being excessive, and in neither of the cases does it appear that a mathematical formula argument was involved or considered, although the court approved the use of blackboards and charts to itemize plaintiff's damages and on which to draw inferences and make calculations *based upon matters in evidence.*

We come then to three cases from the West decided within a short time of each other, *Johnson* v. *Brown* (1959), 75 Nev., 437, 345 P. (2d), 754; *Jones* v. *Hogan* (1960), 56 Wash. (2d), 23, 351 P. (2d), 153; and *Olsen* v. *Preferred Risk Mutual Ins. Co.* (1960), 11 Utah (2d), 23, 354 P. (2d), 575. In the *Johnson case* the extent of the injuries and the verdict do not appear nor does it appear that any claim of excessiveness was made or considered. The Supreme Court of Nevada said at page 447 (of 75 Nev.):

"We feel therefore that the preferable rule in this state in view of our statute and the custom and practice prevalent thereunder is that whether, under the circumstances of the particular case, the arguments of counsel suggesting a mathematical basis for fixing damages for pain and suffering is an improper invasion of the rights of the jury is to be determined by the trial judge in the exercise of judicial discretion.

"Inasmuch as this type of argument may be used only for illustrative purposes, the trial court should insist that it be premised (and in this case it in effect was) by an admonition that the suggestions of counsel are not to be taken as evidence but are merely the thoughts of counsel as to what would be proper damages to award for this item. It should not hesitate to limit counsel whenever it feels that the rights of the jury to determine for itself what fair and reasonable compensation for such items of damages, are being invaded, or to give such further admonition as it deems necessary."

In the *Jones case* (56 Wash. [2d], 23) the Supreme Court of Washington held that an award of damages of $10,000, plus medical expenses, to a woman who sustained a severe lumbosacral sprain from which she would suffer pain *and disability* for a period of two years, and who was hospitalized and in traction for a period of five days, was not excessive, and said, with re-

gard to the mathematical formula argument, at page 32 (of 56 Wash. [2d]):

"Upon this record, we are unable to say any prejudice resulted. We neither approve nor disapprove of the argument in general. Each case must depend upon its own circumstances. We think the conclusion of the Supreme Court of Nevada in *Johnson* v. *Brown, supra,* sets a proper limit. That court said: [here the Supreme Court of Washington quoted the last paragraph above quoted from the opinion in the *Johnson case* of the Supreme Court of Nevada]."

In the *Olsen case* (11 Utah [2d], 23), in an opinion which was largely *obiter,* for the court concluded that the $5,000 limit of defendant's policy sued upon was below an amount which the jury could reasonably assess for the general physical damages of plaintiff, irrespective of pain and suffering, the court concluded at page 25 (of 11 Utah [2d]):

"Nonetheless, we believe and hold that a sensible and fair rule is to leave the propriety of counsel's use of such [mathematical formula] argument to the sound discretion of the trial court, with a cautionary instruction that if permitted such presentation is but lawyer talk, not to be considered as evidence or as a substitute therefor. Absent such instruction, the practitioner runs the risk of a more piercing and less sympathetic review on appeal as to the argument's prejudicial aspect, since the jury has not had the benefit of the trial court's admonition to treat the argument for what it is, and not for what it might be considered by those uninstructed as to its function."

We then come to the Ohio case cited by the plaintiff and various courts as being in favor of the mathematical formula argument, namely, *Miller* v. *Loy* (1956), 101 Ohio App., 405. It does not appear that a mathematical formula argument was either involved or considered. In fact, the court concluded that "since neither the arguments of counsel nor a photograph of the writing upon the blackboard is incorporated in the record, no error appears," and the syllabus of the case states that, "the extent to which a *blackboard sketch* may be employed during the progress of a trial lies within the discretion of the court." (Emphasis added.)

These, then, are the cases upon which the plaintiff relies and which courts usually cite as being authority for the ap-

proval of the mathematical formula argument. It will be observed that in at least nine of those cases it is apparent positively that the mathematical formula argument was not involved or it is not apparent that it was either involved or considered. Some of those cases, such as the *Goldstein case* (Mo.), *supra,* and the *Seaboard Airline Railroad Company case* (Fla.), *supra,* might even be considered opposed to the use of such argument. Admittedly the foregoing analysis ignores many of the arguments made in the various opinions in favor of the mathematical formula argument, but it is apparent that most of those cases were decided on other grounds. The opinions are replete with *caveats* and it is evident that they constitute doubtful authority for the establishment of an important rule of trial, involving, variously, situations where no objection was made, where the verdict was not claimed to be excessive, where the verdict was found not to be excessive, where the discretion of the trial court in its control of the trial or in granting or refusing a new trial was primarily involved, or where the courts' statements as to the mathematical formula argument are actually *obiter.* If it were possible to arrive at a common denominator from them it might be that although there is danger in the use of the mathematical formula argument, notwithstanding such danger and subject to the discretion of the trial court, it may be used for illustrative purposes only if its application is accordingly limited by proper instructions to the jury, and then, if the use of the argument results in a verdict not excessive in amount it shall be allowed to stand, but if its use results in a verdict excessive in amount it shall then be the duty of the trial or appellate court to determine whether or not it shall be corrected by remittitur or by new trial. Such a rule calls for locking the barn after the horse is stolen and, except for the hopeful theory that appropriate instructions will prevent error, error seems to be invited by such procedure.

It should be emphasized that in each of those cited cases the verdict was either not claimed to be excessive, or found by the appellate court not to be excessive, or, as in the *Seaboard Airline case* in Florida, the court had actually ordered a substantial remittitur. None of them involves a verdict found to be excessive.

We prefer to rest the rule of this jurisdiction on what we consider to be sounder authority.

The defendant railroad cites and bases its argument that the mathematical formula argument is improper and that to permit same constitutes error on the landmark case of *Botta* v. *Brunner* (1957), 26 N. J., 82, 138 A. (2d), 713, 60 A. L. R. (2d), 1331; and the cases of *Cooley* v. *Crispino* (Superior Court, 1958), 21 Conn. Supp., 150, 147 A. (2d), 497; *Henne* v. *Balick* (1958), 51 Del., 369, 146 A. (2d), 394; *Faught* v. *Washam* (Mo., 1959), 329 S. W. (2d), 588; *Certified T. V. & Appliance Co., Inc.*, v. *Harrington* (1959), 201 Va., 109, 109 S. E. (2d), 126; *Affett* v. *Milwaukee & Suburban Transport Corp.* (1961), 11 Wis. (2d), 604, 106 N. W. (2d), 274; *Hall* v. *Booth, supra* (178 N. E. [2d], 619); *Caley* v. *Manicke* (1962), 24 Ill. (2d), 390, 182 N. E. (2d), 206; *Duguay* v. *Gelinas* (1962), 104 N. H., 182, 182 A. (2d), 451; *Harper* v. *Bolton* (1962), 239 S. C., 541, 124 S. E. (2d), 54; *Caylor* v. *Atchison, Topeka & Santa Fe Ry. Co.* (1962), 190 Kans., 261, 374 P. (2d), 53; and *King* v. *Railway Express Agency, Inc.* (N. D., 1961), 107 N. W. (2d), 509. Additionally the case of *Crum* v. *Ward* (W. Va., 1961), 122 S. E. (2d), 18, should be cited.

The case of *Cooley* v. *Crispino* (Conn.), *supra*, involves merely the issue as to the exclusion of the *ad damnum* clause from the jury and is not in point with respect to the mathematical formula argument, per se, although its result could logically be extended to exclude such argument. In all the other cases except the *Botta case* and *Duguay case* the courts found the mathematical formula argument improper and erroneous and reversed the judgment of the trial court, although in some other errors were involved likewise requiring reversal.

In the *Botta* and the *Duguay cases* the plaintiffs appealed claiming the inadequacy of the verdict and complaining of error of the trial court in refusing to permit the mathematical formula argument. In the *Botta case* the court held such argument to be an unwarranted intrusion into the domain of the jury and that its exclusion did not constitute error, but affirmed a judgment of the intermediate appellate court reversing and remanding for new trial by reason of other error by the trial court, and to this degree the conclusion of the Supreme Court of New Jersey as to the mathematical formula argument was *obiter*. However, in the *Duguay case* the Supreme Court of

New Hampshire held that the argument was properly excluded and affirmed the judgment of the trial court.

In the *Certified T. V. & Appliance case* (Va.), *King case* (N. D.), *Caylor case* (Kan.), and *Caley case* (Ill.), no other errors were involved, there was no finding by the courts that the verdicts were excessive, and the cases were remanded for new trial solely by reason of the use of the mathematical formula argument. These and the *Duguay case*, therefore, stand for the emphasized proposition expressed by the Supreme Court of Kansas in its syllabus in the *Caylor case, supra* (190 Kans., 261):

"1. Where counsel for the plaintiff in a damage action for personal injuries is permitted to use a mathematical formula, setting forth on a blackboard the claim of future pain and suffering and permanent disability on a per diem or other fixed basis, in his summation argument to a jury, it is *held* on appeal to be improper and constitute reversible error. *When such argument is made prejudice is conclusively presumed as a matter of law* and a new trial must be granted." (Emphasis added in part.)

In the *Henne case* (Del.), *Faught case* (Mo.), *Affett case* (Wis.), *Harper case* (S. C.), and *Crum case* (W. Va.), either other errors were involved or the court found the verdict of the jury excessive. However, in each of these cases the court firmly disapproved of the use of the argument and found same to be erroneous.

Although there are many excellent statements in the cited cases with reference to the impropriety and prejudicial error of such argument our position is probably best stated by the following language of Justice Hallows, and holding, which we approve, of the Supreme Court of Wisconsin in the case of *Affett* v. *Milwaukee & Suburban Transport Corp., supra* (11 Wis. [2d], 604), at page 612 *et seq.*:

"We believe that the arguments advanced disapproving the use of a mathematical formula are more persuasive. The use of a mathematical formula is pure speculation by counsel, which is not supported by the evidence and presents matters which do not appear in the record. The formula may be used to arrive at a gross figure by taking an arbitrary amount of money per day and multiplying it by the number of days in a

year, times the number of years of the life expectancy of the plaintiff. Logically, if this method were followed, the gross amount arrived at should be discounted to its present worth. Seldom is pain constant for the entire life expectancy of the plaintiff, and if the evidence showed that it would be, the intensity of pain normally varies. It is true the formula can be tailored to fit the evidence in cases where pain is sporadic or intermittent, by taking into account only the number of days which the evidence shows future pain might be suffered. This use of the formula is still subject to the basic criticism that the formula must always include an arbitrary dollar amount per day or other period of time, which has no foundation in the record. It is argued that the per diem amount of money is relatively so small that it is obviously reasonable. Such an argument begs the question. The fact is such amount or valuation is not in the evidence and, indeed, could not be.

''The formula is sometimes used to illustrate or to prove the reasonableness of a certain amount of money. The formula is then used in reverse to show that the lump sum is not unreasonable because it represents only a few dollars per month or per day. Generally, in determining the lump sum, the formula is applied as in the first method. Segmentation of a lump sum to show its reasonableness because the per diem amount is small is subject to the same criticism as the other method of use. There is no mathematical way of formulating a formula which will represent all the varying factors involved in pain and suffering in a given case without making assumptions of fact which are not in the evidence. The formula, rather than being an aid as claimed, would result in confusing the jury. The basic reasoning behind the use of any mathematical formula is not so much to aid, or even to persuade, the jury as it is to ultimately establish a fixed standard to displace the jury's concept of what is a fair and reasonable amount to compensate for the pain and suffering sustained as shown by the evidence in the light of the common knowledge and experience possessed by the jury of the nature of pain and suffering and the value of money.

''The difficulty in using a mathematical formula to measure damages for pain and suffering is inherent in the nature of pain and suffering. It cannot be measured by any such mathematical standard. Pain and suffering has no market price. It is not

bought, sold, or bartered. It has no equivalent in a commercial sense. We cannot agree with the reasoning in the *Ratner case, supra*, that the absence of a fixed rule for the measurement of pain and suffering supplies a reason for the use of a mathematical formula. The present rule for measuring damage is as fixed as the nature of the subject matter will permit. True, counsel should be entitled to a reasonable latitude in argument and in commenting on the evidence, its nature and effect, and may make proper inferences which may reasonably arise from the evidence. However, we fail to see where a mathematical formula or a pain-on-a-per-diem or per-month basis has its basis in the evidence, or in logical inferences from the evidence. Such arguments are beyond the scope of proper argumentation.

"The absurdity of a mathematical formula is demonstrated by applying it to its logical conclusion. If a day may be used as a unit of time in measuring pain and suffering, there is no logical reason why an hour or a minute or a second could not be used, or perhaps even a heart beat, since we live from heart beat to heart beat. If one cent were used for each second of pain, this would amount to $3.60 per hour, to $86.40 per twenty-four-hour day, and to $31,536 per year. The absurdity of such a result must be apparent, yet a penny a second for pain and suffering might not sound unreasonable. The principle is the same, whether one uses a second, an hour, or a day as the basic unit of time, because to the unit of time used one must assign some money value which has no foundation in the evidence. We see no difference in using the mathematical formula for illustrative purposes and using it to determine the reasonableness of the amount sought as damages. The use of the formula was prejudicial error."

We, too, conclude that the use of the mathematical formula argument, in and of itself, constitutes prejudicial error, requiring a new trial in the event the verdict may not be cured by remittitur.

It has been held by the Supreme Court of Ohio in *Chester Park Co.* v. *Schulte, Admr.*, 120 Ohio St., 273, that a Court of Appeals has the same unlimited power and control of verdicts and judgments as the trial court and (at page 290) that "if a verdict in an action for unliquidated damages is in the opinion

of the trial court excessive, but not appearing to be influenced by passion or prejudice, the court may with the assent of plaintiff reduce the verdict by *remittitur* to any amount warranted by the evidence." See, also, *Bartlebaugh* v. *Pennsylvania Rd. Co.*, 150 Ohio St., 387.

It is implicit in our holding, that the use of the mathematical formula argument constitutes, in itself, prejudicial error, that it is likewise our opinion that the amount of the verdict is influenced by such argument. However, we do not believe that an appeal to a jury to coldly calculate an amount to be awarded for pain and suffering is an appeal to exercise passion and prejudice. In this respect the Supreme Court of West Virginia in the *Crum case, supra*, points out that the mere suggestion of the existence of pain and suffering "engenders or activates such complex emotions as sympathy, prejudice, compassion and caprice that exist in every normal person, including each of the twelve jurors, and creates a fervent, resolute desire to relieve or aid the sufferer," the effects of which are multiplied by a mathematical formula argument. Nevertheless, the argument itself does not create passion or prejudice and it does not serve to exploit passion and prejudice any more than would descriptions, based on evidence, of the nature of a plaintiff's injuries and the disabilities, pain and suffering, resulting therefrom. We have carefully re-examined the mathematical formula argument herein involved and find that it did not constitute an improper appeal to the passions and prejudices of the jurors, and find that the verdict does not appear to be influenced by passion and prejudice.

We must then consider whether or not the verdict herein was excessive. This involves a weighing of all of the evidence pertaining to damages. *Chester Park Co.* v. *Schulte, supra* (120 Ohio St., 273).

As we have heretofore concluded that there was sufficient evidence in the record to support a total of $91,402 for damages for past medical and hospital expense and for past and future loss of wages, we will consider such amount for such items as established. Plaintiff's attorney, in argument to the jury, conceded that there was no evidence on which may be based a finding as to the amount of future medical and hospital expense, so we will exclude same entirely from our consideration. This

leaves a weighing of all the evidence to determine whether the amount of $281,050 for all other elements of damage, considered by the plaintiff in the category of pain and suffering, is excessive and, if so, by what amount. In this regard it would be impossible to summarize in this opinion the 1,000 pages of evidence, which we have weighed in determining this issue so the following summary is not to be considered all inclusive, and, since pain and suffering is primarily subjective, particularly highlights statements made by Boop in this respect.

Boop testified as to the excruciating pain which he endured when the wheel of the gondola car rolled upon him and for the forty-five minutes thereafter which it took to pull the car from him and during which time he did not lose consciousness; that he did not receive any drugs to hold down the pain until he was in the hospital and ready to have his left leg amputated and disarticulated at the hip joint; that after that he didn't know anything for about a week except that he was having "the horriblest dreams" of railroad cars coming at him continuously; that the medicine given him to control the pain did so to a certain extent but only for short periods at a time; that his scrotum swelled to the size of a football; that day after day the doctors would treat the whole area which was bruised and torn, would cut the dead meat away and treat it with ether which would cause severe pain (Dr. Jones testified that the liquid used was Daiken's solution which is comparable to laundry bleach); that skin grafting started in November and continued until March and required the removal of skin from his right hip and leg and transferral to the area where his left leg had been amputated and the joint disarticulated at the hip; that the areas from which the skin was taken would remain sore for a week to ten days; that his hip bone stuck out and the skin graft wouldn't heal over it, so he was taken back to surgery and the bone was shaved down enough so that it wouldn't protrude; that he was in the hospital from October 15, 1958, to March 18, 1959 (a little over five months); that he got down to 112 pounds; that he first started in on crutches, and therapy started in February before his release from the hospital; that after he went home he had continued seepage from the area where the "hip bone fit in" and continued to have treatment for the seepage by having a gauze strip placed in the finger-size hole and removed from

time to time to promote healing from the "bottom up"; that the hole would occasionally become plugged and "then my misery would be worse"; that finally the seepage stopped; and he testified that, since the time of that recovery and as of June 1961, the time of trial:

"The whole area—the complete area is sore deep within. On the outside it is healed over; deep within in my back, clear over to the center of my spine, from there clear around, deep in the whole area, is sore. You can't press much pressure there without feeling it. It is just—and at nights, if I, too much exercise, such as that in the daytime, those phantom pains is more severe at night with too much exertion during the day, they haven't been many nights I have went since I come home from the hospital, since I quit taking any kind of medicine, been a night that I don't dream—after I really get to sleep, before I go to sleep, that leg—I lay on my side, lay on my right side, and I can lay on my back, I can't lay on my stomach—that is my old, favorite way of laying, but I can't lay on my stomach, can't lay on my left side. I got two choices, my right side and my back. I lay on my back and when I try to get off my back, I can lay there for two hours, drop off to sleep, maybe that way. When I try to get up off my back, it is just like a solid board there, can't move. I got a bar over my bed, * * *. I get a hold of that and pull myself off my back over on to my side. I get on to my side, lay that way. These phantom pains coming down like you could lay your hand right down—it is in the calf of the leg, the knee—down in the heel of that leg that isn't there. Just thousands and millions of needles, and twisting just like your leg that goes to sleep and then it has got a certain point that it always gets down to in the heel, half of the leg. Just continually keep you awake."

Plaintiff testified also that by pressing certain parts of his hip he will finally come to a spot that will relieve the phantom pains as long as he maintains the pressure; that it is "darn near impossible" to get out of bed in the morning because of the stiffness in his back; that his wife helps him do so and helps him put on his pants, shoe and sock; that his scrotum is sore on the bottom, so sore that he can hardly touch it; that one of his testicles was driven "up in his stomach" where it still remains; that his right leg feels cold like the circulation is very poor;

that although the railroad had provided a prosthetic leg for him he has not been able to use it as "it is just a misery to try to wear it"; that although he can now drive a car it would be much more comfortable for him to do so without the prosthetic leg; that scar tissue on his penis and the deformation thereof cause pain which has resulted in reducing his sexual relations with his wife from two to three times a week to not over twice a month; that although he can still do some bank fishing he finds it disagreeable to get into a boat, uncomfortable to sit in one, and impossible to do any casting from a boat; that although he has hunted regularly since a child he can no longer do so; that he can no longer pitch horseshoes or play croquet; that he can toss a ball to his little boy for a distance of about 15 to 20 feet from a chair in which he sits but only for about ten minutes at a time; that although he always did the carpentry, plumbing, electrical, painting, mechanical and yard work around his home, including the building of his own home, he can do none of it now, and his daughter and wife have to do the yard work; that his wife has to help sponge bathe him, trim his toenails, and dress him; that he doesn't go to inside theaters and restaurants by reason of the difficulty of getting in and because people stare at, and children make remarks about, him; and that he had been to see Dr. Jones routinely until about July 13, 1960, and perhaps only twice since then.

Boop also offered the testimony of a Dr. Miller, an expert in orthopedic surgery, who examined him on May 3, 1961, about six weeks before trial, as to the permanency of his injuries and the likelihood of continued pain and suffering, with particular application to the permanency of his phantom limb symptoms and his inability to use a prosthesis.

On the other hand, Dr. Jones, Boop's attending orthopedic surgeon, customarily retained by defendant railroad, testified for the defendant, among other things, to the effect that he last saw Boop for treatment on December 7, 1960, and that he subsequently examined him approximately a month before trial; that the area which has been grafted measures approximately eight to ten inches; that this area has thickened up, has become fairly well toughened skin, and is completely healed at the present time; that there is no evidence of any drainage or open wound; that this skin condition will probably improve for an-

other six or eight months; that "as far as Mr. Boop is concerned, to me phantom limb was never a problem; the man had complaints but it wasn't phantom limb"; that his complaints have been as to very tender area over the pelvis where bone had been resected on the ilium, which area seems under pressure to be rather exquisitely tender, but at the time of last examination appeared to be somewhat lessened; that it is possible for there to be skin breakdown at the amputation site by applying great pressure to it; that Mr. Boop never complained to him of pain during marital relations and claimed that he had no trouble and it worked as well as ever; that he referred Mr. Boop to a general surgeon regarding his testicle, but nothing further has been done about it; that he seems to have adequate circulation in his right leg; that the normal arthritic changes and the degeneration of the discs in the intervertebral spaces, which have occurred over a period of years, are complicating factors due to Mr. Boop's postural changes resulting from the amputation and the non-use of a prosthetic leg; that, in his opinion, with sufficient fitting over a period of six months with close co-operation of the manufacturer and rehabilitation Mr. Boop could use a prosthetic leg without undue discomfort and without breakdown of the skin at the amputation site; that he knows that Boop has had phantom limb symptoms in that he has said, "I feel my big toe ache down there," and "my knee wants to move sometimes," but he has "never complained to me about phantom pain," and "I know that he has had it"; and that he has not complained of severe pain of the phantom limb type, but he has complained of some pain which he has accepted well and is psychologically well adjusted to this.

Objectively it should also be noted that from the record it appears that Mr. Boop is mentally alert, that he was able to testify for some 160 pages of record during most of one day and parts of two other days, and was apparently able to be present during approximately eight days of trial.

On the entire record it is the opinion, finding and judgment of this court that that part of the verdict in the amount of $281,050, which may be considered attributable to past and future pain and suffering (and associated elements of damage), is contrary to the manifest weight of the evidence and excessive, and that the entire verdict of the jury of $372,452 is thereby also

contrary to the manifest weight of the evidence and excessive. We consider and find any amount beyond $195,000, attributable to past and future pain and suffering (and associated elements of damage), as excessive.

For the prejudicial error of the trial court in permitting, over objection, the use of the mathematical formula argument in the plaintiff's summation to the jury, and its further error in refusing a new trial for such reason, the judgment of the trial court for the plaintiff in the amount of $372,452 must be reversed, unless the plaintiff, Boop, shall, within twenty days from this date, enter a remittitur of the amount of $86,050, with interest, and in that event the judgment, less $86,050 and interest thereon, will be affirmed; otherwise the entire judgment of the Common Pleas Court will be reversed and the cause remanded for a new trial.

*Judgment accordingly.*

MIDDLETON, P. J., and YOUNGER, J., concur.