Sibyl I. McCLUGGAGE and Wade C. McCluggage, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. A. No. 6493.

United States District Court
S. D. Ohio, E. D.

Oct. 3, 1966.

Charles E. Shanklin and Robert Mone, George, Greek, King & McMahon, Columbus, Ohio, for plaintiffs.

Robert A. Bell, Asst. U. S. Atty., and Thomas Young, Dept. of Justice, for defendant.

## MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

Edward G. Kyle was a radar technician with the defendant's Department of the Air Force stationed at Paris, Kentucky. He received orders to report to Fort George G. Meade, Maryland for temporary duty as a radar bomb scorer and to select any type of transportation, including his privately-owned automobile, for travel between these points. Reimbursement for use of his personal automobile was to be made at the lowest rate provided by applicable departmental regulations and based on the established most direct mileage between those points. The route he was required to take in accomplishing this travel was not specified in his orders.

Airman Kyle departed Paris in obedience to such order in his privately owned automobile in the early morning of December 29, 1961. Because of adverse weather conditions, at the suggestion of his commanding officer, he proceeded toward the Ohio turnpike to avoid crossing mountains on the most direct route between Paris and Ft. Meade. After he had been en route for some three and one-half hours and was proceeding generally northwardly on U. S. highway route no. 23 in Waverly, Ohio, where such highway is divided for two lanes, each, of traffic traveling in opposite directions, he approached an intersection with Ohio state highway route no. 104, where traffic is controlled by signal lights over the center of the respective north-south lanes of the intersection.

The area abutting the southeast corner of said intersection is used as a parking area for a food store, and the plaintiff Mrs. McCluggage was at the same time departing the said parking area in her husband and co-plaintiff's station wagon. From the parking area, she entered the portion of a roadway which is east of the aforementioned intersection and proceeded toward the intersection in a westwardly direction. At or about the same time, a line of traffic, headed in an eastwardly direction from state highway route no. 104, west of the federal highway route, stopped in obedience to a traffic signal. In this line of traffic was a vehicle operated by Hughie A. Rutledge.

Mr. Rutledge noticed the traffic control signal for southbound traffic on the federal route change from red to green, saw a green station wagon emerge from the aforementioned parking lot and enter the intersection involved, and also saw a Pontiac automobile approaching the same intersection from the south on the federal route. He also saw the Pontiac automobile strike the station wagon on the left side of the latter but then lost sight of the accident until he saw the driver of the station wagon catapulted through the air and land on the pavement. Subsequently, Mr. Rutledge heard the driver of the Pontiac automobile say, "Sometimes the brakes just won't hold." It is undisputed that the driver of this Pontiac automobile was Airman Kyle, and that the driver of the green station wagon was the plaintiff Mrs. McCluggage.

The McCluggage station wagon veered to its right following the collision and traveled just under 62 feet, coming to a stop near the center of the two lanes intended for southbound traffic on the federal route. Mrs. McCluggage was thrown 97 feet to a point in the southernmost edge of the median strip separating the aforesaid lanes of traffic. An ambulance transported Mrs. McCluggage and Airman Kyle to a hospital from the scene of the wreck. En route the ambulance driver, David Boyer, heard

Airman Kyle state: "I didn't see the light."[1]

The two sets of signal devices controlling traffic through the intersection involved were coordinated so that when one colored signal was showing for northbound and southbound traffic on the federal route, a different signal was simultaneously showing for eastbound and westbound traffic. The respective lights were so regulated in sequence that for northbound and southbound traffic, the green lights were showing for 29 seconds, followed by a three-second showing of amber, which was followed by a showing of red for fifteen seconds.

Airman Kyle testified that he was approaching the intersection at a speed of about 50 miles an hour; that he first saw a red traffic signal when he was about 100 yards from the intersection; that he noticed a green 1958 Ford approaching the same intersection from his right; that he thereupon slowed his speed to about 40 miles an hour; that when he was about 45 to 50 yards from the intersection, the light changed to green for him; that he estimated he then reached the intersection in four or five seconds; that he did not see the color of the light as he entered the intersection; and that when he realized a collision with the green Ford was in prospect, he applied his brakes, which he said did not hold, but he added that his car skidded on the pavement into the side of the other vehicle.[2]

■ The Court is of the firm opinion that the proximate cause of the collision between the Kyle and McCluggage vehicles and the resulting injuries and damages to the plaintiffs was the negligent failure of the defendant's agent, Airman Kyle, to yield the right-of-way to the McCluggage vehicle at the said intersection in obedience to the directions of the signal device regulating traffic at such intersection, O.R.C. section 4511.12 (formerly G.C. section 6307–12); 1939 O.A.G. No. 1557, at a time when Mrs. McCluggage was free of any negligence. The Court further finds and concludes that Airman Kyle was acting in the line of his duty as a member of the armed forces of the defendant United States and, thus, within the scope of his office or employment, 28 U.S.C. section 2671, at the time of this accident, so that the defendant United States is liable for the negligence of Airman Kyle for money damages for injury to, and loss of property by, the plaintiffs while Airman Kyle was so acting, under circumstances where the United States, if a private person, would be liable to the plaintiffs in accordance with the law of Ohio. 28 U.S.C. section 1346(b).

■■ Accordingly, the plaintiff Mrs. McCluggage is entitled to recover damages as compensation for:

her permanent injuries, Hanna v. Stoll (1925), 112 Ohio St. 344, 147 N.E. 339;

her pain and suffering, Flory v. New York Central Railroad Co. (1950), 170 Ohio St. 185, 190, 163 N.E.2d 902;

her mental anguish, Smith v. Pittsburg, Ft. Wayne & Chicago Railway Co. (1872), 23 Ohio St. 10, 18–19; Clark Restaurant Co. v. Rau, C.A.Ohio (1931), 41 Ohio App. 23, 26, 179 N.E. 196; Ward Baking Co. v. Trizzino, C.A.Ohio (1928), 27 Ohio App. 475, 485–486, 161 N.E. 557; Cincinnati Traction Co. v. McKee, 6th C.C.R.(N.S.) 426, affirmed (1908), 77 Ohio St. 634, 84 N.E. 1126;

for the deprivation of her ability to enjoy life and the duties of marriage, Boop v. Baltimore & Ohio Railroad Co., C.A. Ohio (1963), 118 Ohio App. 171, 176, 193 N.E.2d 714; Davis v. Zucker (1951), Ohio App., 106 N.E.2d 169, 62 O.L.A. 81, 84; Smith v. Pittsburg & West. Ry. Co., 90 F. 783, 112 Ohio F.Dec. 188; and

---

1. According to Airman Kyle, this statement was: "She jumped the light, and I skidded into her."

2. There is no evidence that the pavement was wet, although there is testimony that there had been some precipitation in the area earlier that morning. Airman Kyle's testimony that (a) his brakes did not hold and (b) that his wheels skidded is inconsistent.

for the impairment of her future earning capacity, Kidd v. Beals (1937), 24 O.L.A. 326, 330–331; Bartlebough v. Pennsylvania Ry. Co., 78 N.E.2d 410, 51 O.L.A. 161, 165, appeal dismissed (1948), 149 Ohio St. 585, 79 N.E.2d 912. The plaintiff Mr. McCluggage is entitled to recover damages as compensation for:

his expenses necessarily incurred, and reasonably certain to be incurred, in caring for his wife, Baltimore and Ohio Railroad Co. v. Glenn (1902), 66 Ohio St. 395, 398, 64 N.E. 438;

his loss of his wife's services in the home, Baltimore and Ohio Railroad Co. v. Glenn, *supra,* 66 Ohio St. 395, 64 N.E. 438; Hrvatin v. Cleveland Ry. Co., C.A. Ohio (1942), 69 Ohio App. 499, 502, 44 N.E.2d 283; and

for his loss of consortium and the conjugal society of his wife, Baltimore and Ohio Railroad Co. v. Glenn, *supra;* 28 O.Jur.(2d) 127, Husband and Wife, sec. 7. Both are entitled to recover damages for the loss of their respective items of personalty.

In summary, under Ohio law:

" * * * A plaintiff in a civil action is entitled to be made whole for the injury to person and property, including direct and proximate loss, physical pain and suffering * * *, medical and hospital expenses if any incurred, mental anguish and wounded sensibilities. * * " Saberton v. Greenwald (1946), 146 Ohio St. 414, 432, 66 N.E.2d 224, 232, 165 A.L.R. 599.

Both plaintiffs instituted actions against the defendant United States under the Federal Tort Claims Act. The action was tried by the Court without the intervention of a jury on January 11, 12, and 13, 1966. The severity of the damages to the plaintiff Mrs. McCluggage and the unusual damages sus-

tained by the plaintiff Mr. McCluggage prompted the Court deliberately to hold an adjudication in abeyance, lest the damages awarded exceed the bounds of reason, so shocking were the revelations of injury and damage at the time of trial.

██ ██ As a result of her head's striking the pavement in the aforementioned manner, the plaintiff Mrs. McCluggage sustained severe lacerations of her right forehead, resulting in permanent cosmetic scarring; a cerebral contusion; a right parietal frontal skull fracture; total destruction of the left temporal lobe of her brain, which was converted into pulp; diffuse damage to the right frontal lobe, the cortex and other areas of her brain; and there has since developed a severe chronic brain syndrome with depressive reaction. She was rendered unconscious, with bleeding from her mouth, in her fall, remained unconscious for about eighteen hours until the surgical performance of a left temporal craniotomy the day following the accident, was hospitalized for the succeeding thirty-one days, during parts of which she was unconscious or subconscious, and, with full time attention, recuperated in her home for the succeeding two years. She has no realization of her problems, is unable to establish successfully rapport with others, engages frequently in conversations in a manner inappropriate to the circumstances, exhibits fabrication in her speech, and has poor general memory [3] and poorer recent memory. Her judgment is consistently poor. She is, for most purposes, incompetent (and the Court thinks, needs constant nursing care). Her intelligence quotient has fallen from 125 to between 99 and 103.[4] She "rambled" in answering questions during the trial,

3. Mrs. McCluggage testified she has no recollection whatever of the accident in which she was involved, and this is supported by competent opinions with a reasonable degree of medical certainty.

4. The Court understands that a person's "I. Q." indicates what that person is

*capable* of doing, as opposed to what that person actually *does.* Other factors seem to be involved in the ability of an adult to use his intelligence, and certainly, a mature intact brain must be a primary prerequisite. *Cf.* The Measure and Appraisal of Adult Intelligence (4th ed., 1958), Wechsler.

and her answers frequently were inappropriate and sometimes incoherent (from the standpoint of judiciousness), all which is consistent with the diagnosis of severe chronic brain syndrome.

Additionally, Mrs McCluggage sustained an increase of deep reflexes and a Hoffman (pathological reflex) on her right; asphasia; has undergone behavior changes; had a post-traumatic convulsive seizure; and her electroencephalographic tests are abnormal. These symptoms indicate extensive damage to Mrs. McCluggage's brain.[5] In summary, the Court finds that it is most difficult, if not virtually impossible, for Mrs. McCluggage now to be clear and consecutive in regard to almost any of life's situations with which she is, and will be, confronted.

Mrs. McCluggage is no longer able to perform properly her duties and enjoy her privileges as a homemaker, a mother and a wife. Her normal social activities have been greatly curtailed, and, when undertaken, are usually unsatisfactory. She cannot read, write or speak effectively at all times. She has no remaining ability to learn new things. Even minor decisions appear to exceed her competence. When confronted with a problem, she often becomes anxious, agitated, evasive, sullen, irritable, frequently aggressive, and sometimes hysterically enraged. There are many periods when she isolates herself, sinking deeply into depression and despondency. She has threatened her husband, her children and others with bodily harm. She argues with her young daughter on a level which might be expected of another child of like age, and invites her daughter to "run away from home". She is an unresponsive sex partner.

Under the evidence, these examples of Mrs. McCluggage's present condition are conspicuous changes from her original personality and make-up. Prior to her injuries, she was intelligent, pleasant, happy, active, confident, a leader, a good speaker and an interesting conversationalist, liked, admired and respected by her friends and social contacts, a loving mother and companionable wife, who had made a tranquil and orderly home for her family, where her children gladly received and responded to training, guidance and family love. She was interested and capable as a homemaker, in sewing and cooking, and in tending her three children. She was active and effective in her church, singing in the choir and editing the church newspaper. She supported the schools her children attended, through parent-teacher and other activities. She enjoyed playing bridge and played well.

She had a limited place in the labor force. She had begun working in connection with her family's newspaper at the age of 15. She completed two years of university training.[6] Soon thereafter, the plaintiffs were married, and to assist her husband in defraying the expenses of college training for their children,[7] Mrs. McCluggage became employed as a newswriter for the local radio station in her community. She had gross earnings of $22 a week in this part-time endeavor when she was injured.

Mrs. McCluggage, who was 52 years of age at the time of trial, had enjoyed reasonably good health prior to her injuries. Her one prior health problem had caused her no disability and was described as minor, treatable and reversible by her physicians. Her stipulated life expectancy is 28.07 years.

5. While the brain laceration and pulping were found on the right side of the brain, the fracture of Mrs. McCluggage's skull was on the opposite side. This indicates that her brain was dashed against her right skull bone, which could account for damage to the entire organ.

6. Mrs. McCluggage performed better than 94% of those taking the Ohio State University psychology test form 19 in 1937.

7. At the time of the trial, one of the plaintiff's sons, who was a witness, was in his second year of training in a medical college.

This Court finds and concludes that the described injuries are permanent, and, for practical purposes, are total. The evidence is strong that this plaintiff's condition, in all probability, has attained the maximum improvement which reasonably can be anticipated. Indeed, it is reasonably inferable from all the evidence that it will be comparatively fortuitous if Mrs. McCluggage can live outside an institution for as long as the next ten years.

The author of this memorandum has not before become aware of any situation wherein the derivative damages of a husband are greater than those of the plaintiff Mr. McCluggage in this lawsuit. It is stipulated that he became liable for $7,920.09 in expenses for the reasonable and necessary care of his wife. He is reasonably certain to have additional expenses of this character in the future. The cost of any future institutional care for Mrs. McCluggage would exceed $300 per month. It will cost this plaintiff more than $4,000 annually to get done the things he could rightfully have expected his wife to do, but for this accident. He and his wife sustained property damages of $1,042.50.[8] Mr. McCluggage has been deprived of a good wife (with all that description implies), an efficient mother for his young daughter (pretermitting the older children, for this purpose), a satisfying sex partner, and an all-around competent helpmate. In the process he has gained the fiscal, time consuming and emotionally debilitating responsibility for a wife of adult years but child-like propensities. Whatever dream-like qualities his family life once offered have now taken on the aspects of a protracted nightmare.

This man is a physicist-engineer with the Atomic Energy Commission, specializing in safety procedures in nuclear engineering and the handling of nuclear material. His education exceeds that of a master of science. But, from the date of this accident and for the foreseeable and reasonably predictable future, his principal occupation has been, and must necessarily be, that of serving as Mrs. McCluggage's devoted and long-suffering husband and as an excessively burdened head of a household.

In approaching the nearly insurmountable task of assessing damages which these plaintiffs have sustained, the Court has reviewed many awards by Ohio courts.[9] See: Shaffer v. Barberton (1965), no. 245,754, Court of Common Pleas, Summit County; Kutza v. Parker (1961), no. 62977, Court of Common Pleas, Lorain County; Rice v. Yellow Cab Co. (1960), Cuyahoga County; Pados v. United States, D.C.Ohio (1963), civil action no. 6159, Southern District, Eastern Division; and Eblin v. United States, D.C.Ohio (1965), civil action no. C 63–190, Northern District, Western Division. The Court has also considered the rules followed by Ohio courts in awarding damages for injuries of this nature. See: Whelan v. New York, L. E. & W. R. Co. (1889), 38 F. 15, 6 Ohio F.Dec. 87; Dussel v. Akron St. R. Co. (1891), 10 Ohio Dec. 631, 8 Ohio N.P. 622; Saberton v. Greenwald (1946), 146 Ohio St. 432, 66 N.E.2d 224, 165 A.L.R. 599; Imperial Oil Limited v. Drlik, C.A. 6th (1956), 234 F.2d 4, 10 [10–12]; Bagyl v. Miller, C.A.Ohio (1965), 3 Ohio App.2d 371, 210 N.E.2d 887, 32 O.O.2d 518, 521.

Based on all the foregoing, the Court finds and concludes that the plaintiff Mrs. McCluggage's damages are $130,720.00, and that the plaintiff Mr. McCluggage's damages are $116,962.59.

Unless counsel submit to the clerk of this Court a form of judgment, consistent with this opinion, which is appropriate in Tort Claims actions, the clerk

---

8. It is stipulated that Mr. McCluggage will recover all damages involved to the personalty of the plaintiffs.

9. The trier of the facts herein is more familiar with the awards in analogous cases by the courts of Tennessee.

will after twenty (20) days herefrom enter judgment for the respective plaintiffs and against the defendant for these respective sums.