JOURNAL ENTRY AND OPINION
Defendant Charles Nickleberry appeals from his conviction for aggravated murder, aggravated robbery, felonious assault and having a weapon while under disability. For the reasons set forth below, we affirm.
On December 29, 1998, defendant was indicted for aggravated murder, attempted murder, two counts of aggravated robbery and having a weapon while under disability. The aggravated murder charge contained felony murder, mass murder[1] and firearm specifications and the remaining charges contained firearm specifications. The charges arose in connection with the December 5, 1998, attack on Kendrell Reddix and Quiana Manigault during which Reddix was shot to death. Defendant pleaded not guilty.
On February 19, 1999, the trial court held a hearing on a motion for voir dire examination of the state's eyewitnesses. Cleveland Police Det. Robert Matuszny testified that approximately six days after the shooting, he met with Quiana Manigault at her grandmother's home and had her view two photo arrays. The first array displayed five photographs and contained a suspect whose photograph was obtained through the sheriff's office. Det. Matuszny therefore obtained other photographs from the sheriff in order to complete the array. The second array contained six photographs which were obtained from the Cleveland Police Department. Manigault selected defendant's photograph from the second array. Det. Matuszny stated that nothing was done to influence the identification. He further stated that the photographs were chosen for the array based upon skin tone and facial hair. He admitted, however, that four of the six photographs of the second array depicted suspects in the investigation and the photograph of the suspect from the sheriff's array had staple marks.
Manigault testified that she met with the detectives six days after the shooting. They showed her two rows of photographs two or three times and did nothing to influence her choice. She further testified that she had an unobstructed view of the perpetrator for five to ten minutes from a close distance. She also testified that she selected the perpetrator from among the photographs and that the perpetrator is defendant. She again identified defendant from the second array and stated that she had seen him at her friend Tiffany's house prior to the shooting. She recalled from the incident that he was approximately 24 years old, 5'6" with dark skin and glasses.
She admitted that there were differences between the photos and that one depicts a person in orange clothing and another depicts someone who is bald. She also acknowledged that she knew two of the people in the second array through her friend Tiffany. The trial court accepted the pretrial identifications and the matter proceeded to trial on the merits on October 7, 1999.
At the start of the proceedings, defendant stipulated that he has previously been convicted of attempted drug trafficking and agreed that the offense of having a weapon while under disability would be tried to the court. For the state's case-in-chief, Quiana Manigault testified that she met Reddix at her job at Imperial Sports and the two became friends. Tiffany Little was Manigault's co-worker at Imperial Sports. On the day of the shooting, Manigault worked until 7:00 p.m. then went home. At approximately 8:30 p.m., she visited Little and her roommate, Aziza Gray. After about twenty minutes, Little and Manigault walked to the store and walked to Manigault's cousin's house. They then stopped at a barbeque stand to get something to eat. Reddix paged Manigault at approximately 10:00 p.m. Manigault spoke to him after the women returned to Little's house.
Shortly after midnight, Reddix told Manigault that he would pick her up at Little's and give her a ride home. Manigault went out to Reddix's Explorer when she heard the horn. She then returned to the house because she forgot her purse. After she returned to the car, a man knocked on the driver's window of the car. Manigault looked to her left and saw defendant with a gun. Defendant was wearing a puffy burgundy colored Indian's coat. A second man stood to her right at the passenger side window. Manigault did not look at this man because she was too frightened. According to Manigault, defendant told Reddix to open the door. Reddix opened the door and defendant demanded that Reddix empty his pockets. Reddix said that he had nothing and defendant then hit Reddix with his gun. He patted Reddix's pockets and Manigault heard a gunshot. Reddix said, I'm dead, as he was shot. Manigault was shot in the left arm, apparently from the same bullet.
Manigault next indicated that defendant pulled Reddix from the car and checked the backseat area. Defendant then got into the driver's seat and said, Bitch, get out. Manigault got out and lay on the ground. Her purse, keys and school identification remained in the car. After the men drove away, Manigault returned to Little's house for help.
Manigault was hospitalized for two days following the shooting. Later, she stayed at her grandmother's house because she had received threats. While at her grandmother's, Manigault met with Cleveland Police detectives and identified defendant's photograph from the second of two arrays which they presented to her. Manigault stated that she had met the defendant briefly on a previous occasion at Little's house several weeks prior to the shooting.
On cross-examination, Manigault acknowledged that she had given police a description of the second man while she was in the hospital. She admitted that she did not immediately tell the police that she had previously met defendant through Little and that defendant's teeth had a distinctive gap.
Aziza Gray testified that she lives with Little. Gray said good-bye to Manigault but Manigault returned shortly thereafter because she forgot her purse. Gray heard commotion and cursing moments later and looked out of the side window. Gray observed defendant in a burgundy or black Indians starter jacket standing at the driver's side of a champagne colored vehicle. Gray heard gunshots and saw defendant push the driver from the vehicle.
Tarlecia Littlejohn, the occupant of a car which happened to be passing at this time, observed a man reaching into the vehicle.
Ricardo Ortiz testified[2] that he was convicted of drug possession in Cleveland. He faced sixteen years incarceration but subsequently received six years after he agreed to testify against one of his co-defendants. Ortiz claimed that he befriended defendant and defendant eventually told him that on December 5, he went out to highjack a car. He approached a man and a woman in an Explorer and pulled a gun in the heat of the moment. The gun went off and both were struck. Ortiz also claimed that defendant toldRicardo Ortiz him that he took the Explorer but abandoned it a few blocks away. He reportedly told Ortiz that his girlfriend would provide an alibi for him. He thought that his defense was credible because he had known the woman he had shot for a long time, thus making it implausible that defendant was the killer.
On cross-examination, Ortiz claimed that the man was shot in the head. There was also evidence that he requested release for time served or the minimum term in exchange for his cooperation in this matter. The state agreed to contact the sentencing judge for him after the conclusion of the instant matter.
Steven Bouyer next testified[3] that while in jail, defendant told him that he approached a man and woman in a truck near his girlfriend's house. He reportedly shot them and another man removed a bag from the vehicle. Bouyer claimed that defendant stated that the woman lived and he was sorry that he had not killed her. Bouyer further testified that defendant's girlfriend was going to testify that they were watching Change of Heart together when the shooting occurred. Defendant told Bouyer that he and the decedent were friends.
Bouyer also claimed that defendant asked him to contact a welfare fraud investigator that they knew in order to find the surviving witness. Defendant also reportedly told Bouyer that he prefers 9 mm handguns.
On cross-examination, Bouyer admitted that he has an extensive record.
Cleveland Police established that a 9 mm spent shell was recovered from the scene. A pellet recovered during the initial investigation was of a weight consistent with a 9 mm pellet. No gun was recovered. The police received several tips in this matter and eventually arrested defendant.
Deputy Coroner Joseph Felo testified that Reddix died from a gunshot wound which entered on his left side, damaged his heart and liver and exited on his right side. He also had a fresh bruise and two scrapes on his head. There were no drugs in his system.
Elizabeth Lansky, a forensic scientist with the coroner's office, testified that based upon the presence of fouling on Reddix's clothing, he was shot from a distance of approximately six inches. Nitrites were present on Manigault's clothing which indicated that she was approximately three feet away when the weapon was fired. Her blood was present in the decedent's car.
Defendant elected to present evidence and testified that he contacted homicide detectives on December 17, 1998. Detectives subsequently interviewed him at the homicide unit, but according to defendant, they did not provide him with Miranda warnings.
Defendant also presented the testimony of Solomon Fulero, Ph.D. who testified that eyewitness identification may be unreliable because of a variety of factors. He admitted, however, that these factors are considered applicable where the eyewitness is viewing a stranger and not someone he or she has met before.
Finally, Mary Smith testified that she lives near the area of the shooting and was outside looking for her son when she heard a gunshot. She then saw Michael Young in a golden brown van. Later that evening, she saw Young. She told him to do what is right and he reportedly stated that he would. Smith reported the matter to police in May 1999 after her grandson had an altercation with Young.
On cross-examination, she acknowledged that she told homicide detectives that another man was with Young in the van. At the close of all of the evidence, the state amended the attempted murder charge to set forth a charge of felonious assault. Defendant was subsequently convicted of all charges and specifications except the felony murder specification of the aggravated murder charge. He was sentenced to twenty years to life for aggravated murder plus three years for the firearm, seven years for felonious assault, nine years each for the aggravated robbery charge, and four years for having a weapon while under disability. The aggravated robbery charges were ordered to be served concurrently but the remaining counts were ordered to be served consecutively. Defendant now appeals and assigns nine errors for our review.
Defendant's first assignment of error states:
 THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO SUPPRESS AN UNDULY SUGGESTIVE IDENTIFICATION PROCEDURE.
Within this assignment of error, defendant complains that Quiana Manigault chose his photograph from an unduly suggestive photo array and the trial court therefore erred in refusing to suppress her identification.
To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and that the identification itself was unreliable under the totality of the circumstances. Manson v. Brathwaite (1977), 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140; Neil v. Biggers (1972), 409 U.S. 188, 199, 34 L.Ed.2d 401, 93 S.Ct. 375; Simmons v. United States (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247. See, also, State v. Broom (1988), 40 Ohio St.3d 277, 284.
In Neil v. Biggers (1972), 409 U.S. 188, 199-200, 93 S.Ct. 375,34 L.Ed.2d 401, the United States Supreme Court set forth the following factors to be considered in examining an identification procedure and its impact:
 "* * * [W]hether under the `totality of the circumstances' the identification was reliable even though the confrontationprocedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. * * *"
The focus, under the "totality of the circumstances" approach, is upon the reliability of the identification, not the identification procedures. State v. Lott (1990), 51 Ohio St.3d 160, 175; Manson v. Brathwaite (1977), 432 U.S. 98, 114 ("* * * reliability is the linchpin in determining the admissibility of identification testimony * * *."); State v. Moody (1978), 55 Ohio St.2d 64, 67 ("[a]lthough the identification procedure may have contained notable flaws, this factor does not, per se, preclude the admissibility of the subsequent in-court identification.")
In this instance, the photographs all depict men with short hair, short facial hair and round or full faces. Defendant's photograph is not distinctive and the array is not suggestive. Moreover, it is clear to this court that there was sufficient independent opportunity for the eyewitnesses to view defendant. Manigault had an unobstructed view of the perpetrator for five to ten minutes from a close distance and she had previously met him at Tiffany's house several weeks prior to the shooting. She recalled from the incident that he was approximately 24 years old, 5'6" with dark skin and glasses. Therefore, defendant cannot demonstrate under a totality of the circumstances that the identification was unreliable. State v. Waddy (1992), 63 Ohio St.3d 424, 438.
The first assignment of error is without merit.
Defendant's second assignment of error states:
 THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR MISTRIAL FOLLOWING IMPROPER TESTIMONY THAT A STATE'S WITNESS HAD BEEN THREATENED BY THE APPELLANT.
Defendant next complains that the trial court erred in refusing to grant a mistrial after evidence was presented that Manigault had been threatened and that Aziza Gray was afraid to testify.
The grant or denial of an order of mistrial lies within the sound discretion of the trial court. State v. Garner (1995), 74 Ohio St.3d 49,59. Absent a showing that the accused suffered material prejudice, a reviewing court will not disturb the exercise of that discretion. State v. Sage (1987), 31 Ohio St.3d 173, 182. "Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." Garner, supra. Moreover, a jury is presumed to follow the instructions, including curative instructions, given it by a trial judge. See State v. Loza (1994), 71 Ohio St.3d 61, 75.
In this case, defense counsel first elicited that Manigault was afraid and the state then inquired as to why this was so. Moreover, the trial court strongly admonish[ed] the jury to disregard any statements or threats which were ever made because there was no evidence of that before the court. (Tr. 1092). It is presumed that the jurors followed this curative instruction. Moreover, the record of the case does not reveal any prejudice to defendant. The trial court did not abuse its discretion in denying the motion.
This assignment of error is without merit.
Defendant's third assignment of error states:
 THE TRIAL COURT ERRED IN PERMITTING RICARDO ORTIZ AND STEVEN BOUYER TO TESTIFY BECAUSE THEIR TESTIMONY WAS INHERENTLY UNRELIABLE.
Defendant next asserts that the testimony of Ortiz and Bouyer concerning their discussions with defendant in jail, was not reliable and should not have been admitted.
Under Evid.R. 401, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A). A trial court enjoys broad discretion in admitting evidence. This court will not reject an exercise of discretion unless it clearly has been abused and the criminal defendant thereby has suffered material pre-judice." State v. Long (1978), 53 Ohio St.2d 91, syllabus.
In this instance, the evidence was probative of the issue of defendant's guilt or innocence, and was not unfairly prejudicial. We find no abuse of discretion. Accord State v. Soke (1995), 105 Ohio App.3d 226. Moreover, as the court stated in State v. Wogenstahl (November 30, 1994), Hamilton App. No. C-930222, unreported:
 The heart of Wogenstahl's argument is either that inmate testimony should not be allowed in a criminal prosecution or that a heightened degree of scrutiny should be applied to its admissibility. Both the Ohio Rules of Evidence and Ohio case law require the rejection of such a proposition. Evid.R. 402 reflects a policy in favor of the introduction of relevant evidence from a competent witness. The listed exclusions for witnesses on competency grounds in Evid.R. 601 do not include inmates.
The Ohio Supreme Court has stated the following in In Re Lieberman (1955), 163 Ohio St. 35, 38, 125 N.E.2d 328, 330:
 The testimony of witnesses either convicted or charged with felony is competent. Since the testimony of such witnesses is competent, we are led to the further question: Who shall determine the credibility of such witnesses? It is universally accepted that the jury, or the trial court where there is no jury, is the sole judge of the credibility of witnesses and of what weight is to be given this testimony.
Wogenstahl is arguing, in effect, that this court should change the law and remove credibility determinations for inmate testimony from the jury. That is not within our province.
Moreover, although defense counsel insisted that Ortiz's discussion with defendant were a form of custodial police interrogation requiring warnings and presence of counsel, this claim is completely unsupported in the record. Ortiz was housed in this county to obtain information on drug dealing and not to elicit information concerning this homicide. Further, Bouyer's testimony reveals that he contacted police after the incriminating statements were made to him.
This assignment of error is without merit.
Defendant's fourth assignment of error states:
 THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO COUNSEL DUE TO THE ACTIONS OF GOVERNMENT AGENTS RICARDO ORTIZ AND STEVEN BOUYER.
Within this assignment of error, defendant asserts that Ortiz and Bouyer were intentionally placed with defendant in jail in order to obtain incriminating statements from him.
This claim lacks support in the record and is accordingly without merit. L.A.D. v. Bd. Of Commrs. (1981), 67 Ohio St.2d 384, 388.
Defendant's fifth assignment of error states:
 THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO CONVICT HIM OF THE OFFENSES CHARGED.
Here, defendant asserts that there is insufficient evidence linking him to the attack on Reddix and Manigault.
In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Supreme Court stated:
 `Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law. Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim. R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is legally insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
In State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, the Court described the role of the appellate court in reviewing a challenge to the sufficiency of the evidence supporting a conviction:
 An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Id., at paragraph two of the syllabus, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 520,.
In this instance, Manigault testified that defendant approached her and Reddix with a gun. He struck Reddix then shot him after Reddix failed to produce money. Further, Aziza Gray testified that she observed defendant at the driver's side of the vehicle with a gun. Aziza also heard gunshots and saw defendant push the driver from the vehicle. Bouyer testified that defendant told him that someone with him removed a bag from the truck. The convictions are supported by sufficient evidence.
This assignment of error is without merit.
Defendant's sixth assignment of error states:
 THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Defendant next maintains that the jury lost its way in convicting him of the offenses.
In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court set forth the role of an appellate court in determining whether a judgment is against the manifest weight of the evidence:
 When a court of appeals reverses the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs [v. Florida (1982), 457 U.S. 31,] at 42, 102 S.Ct at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 (The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should only be granted in the exceptional case in which the evidence weighs heavily against the conviction.)
Moreover, the credibility of witnesses and the weight attributable to their testimony are primarily matters for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Applying the foregoing, we note that the state presented two witnesses who identified defendant as the assailant and defendant made multiple admissions in this instance. Defendant's chief opposition evidence was that the eyewitness identifications may be unreliable but this evidence was generally applicable where the eyewitnesses had not previously met the defendant. We are unable to conclude that the jury lost its way in convicting defendant of the offenses and the convictions are not against the manifest weight of the evidence.
This assignment of error is without merit.
Defendant's seventh assignment of error states:
 APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BECAUSE THE PROSECUTION WITHHELD EXCULPATORY MATERIAL.
Next, defendant asserts that he was denied a fair trial because the prosecuting attorney did not disclose to him that Manigault and Gray had smoked marijuana earlier in the evening before Reddix was killed. The record indicates that this information was disclosed in oral summaries of Det. Matuszny's police report, after the women had already testified.
In Brady v. Maryland (1963), 373 U.S. 83, 87, 83 S.Ct. 1194,1196-1197, 10 L.Ed.2d 215, 218, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In United States v. Bagley (1985), 473 U.S. 667, 682,105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494, the United States Supreme Court expounded on the "materiality" of evidence in a Brady context:
 "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome."
In United States v. Agurs (1976), 427 U.S. 97, 107,49 L.Ed.2d 342, 96 S.Ct. 2392, the Court further explained:
 "The rule of Brady * * * arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." (Emphasis added.)
Applying this rule, the Supreme Court in State v. Wickline (1990),50 Ohio St.3d 114, stated as follows:
 As the alleged exculpatory records were presented during the trial, there exists no Brady violation requiring a new trial.
Similarly, in this instance, the information concerning the witnesses' marijuana use was provided during the trial and indeed, defendant's trial counsel questioned three of the state's witness, including Manigault and Gray, regarding whether Manigault and Little had been smoking marijuana earlier in the evening. (Tr. 1367, 1547, 1554). Later, the state presented evidence that Manigault told police that she had smoked marijuana earlier in the day on December 5, 1998. There is no Brady violation requiring a new trial.
This assignment of error is without merit.
Defendant's eighth assignment of error states:
 THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BASED ON MISCONDUCT OF THE PROSECUTING ATTORNEY.
Within this assignment of error, defendant complains that the prosecuting attorney made an improper remark in closing argument when he stated, If your home was broken into, your property taken, important heirlooms and family albums, wouldn't you appreciate someone coming forward and saying, `hey, I know who did it and can tell you where the property is?' The prosecuting attorney therefore used a golden rule argument because he appealed to the jury to abandon their position of impartiality by placing themselves in the place of one of the parties. Boop v. The Baltimore Ohio Railroad Co. (1963), 118 Ohio App. 171,174.
Generally, a "golden rule" argument is improper. However, a "golden rule" comment during closing argument is not per se prejudicial so as to warrant a new trial. See Dillon v. Bundy (1991), 72 Ohio App.3d 767,775.
Moreover, considerable latitude is permitted in closing argument. State v. Maurer (1984), 15 Ohio St.3d 239, 269. The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudiciallyaffected substantial rights of the defendant. State v. Smith (1984), 14 Ohio St.3d 13, 14; State v. Lott (1990), 51 Ohio St.3d 160, 165. The closing argument is considered in its entirety to determine whether it was prejudicial. State v. Moritz (1980), 63 Ohio St.2d 150, 157.
Moreover, to the extent defendant did not object to allegedly improper statements, all error is waived but for plain error. State v. Slagle (1992), 65 Ohio St.3d 597, 604. Plain error is established when, but for the error, the outcome of the trial clearly would have been otherwise. State v. Long, supra. Applying the foregoing, we find no plain error. Considering the statement in its entirety, the comment did not prejudicially affected substantial rights of the defendant. Defense counsel repeatedly denigrated Ortiz and Bouyer as "snitches"[4] and criticized the state for dealing with them. He implored the jury to consider whether they created information. (Tr. 1679). The prosecuting attorney then made the brief remarks challenged herein as to the usefulness of using information to solve crimes. The court informed the jury that the attorneys remarks were not evidence but were merely the attorneys' spin * * * as to what they thought the evidence displayed to you. (Tr. 1627-1628). Later the court admonished that the arguments were not to be considered as evidence. (Tr. 1754)
This assignment of error is without merit.
Defendant's ninth assignment of error states:
 THE SENTENCE IMPOSED BY THE TRIAL COURT WAS IMPROPER IN LIGHT OF PREVAILING CONSTITUTIONAL AND STATUTORY GUIDELINES.
For his final assignment of error, defendant asserts that the trial court's findings are insufficient to justify the imposition of consecutive sentences.
R.C. 2929.14(E) (4) permits the imposition of consecutive sentences only if the court makes certain findings. First, the trial court must determine that consecutive sentences are "necessary to protect the public from future crime or to punish the offender, and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C.2929.14(E) (3). Second, the trial court must find present at least one factor listed in R.C. 2929.14(E)(4):
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
When imposing consecutive sentences upon an offender, the trial court is required to state the reasons for imposition of such sentences. R.C.2929.19(B)(2)(c); State v. Edmonson (1999), 86 Ohio St.3d 324, 326.
In this instance, the trial court noted that defendant had been to prison five previous times. The court then stated as follows:
* * *
 The prison system has failed to rehabilitate you and make you into an individual that can live peacefully in society and without committing crimes or doing violence to another.
 Therefore, I feel it is necessary to impose consecutive sentences in this case in order to protect the public. A consecutive sentence would not be disproportionate to the seriousness of your conduct.
 Taking the life of another is the most serious crime we have in this society.
* * *
 I feel that you pose an extreme danger of future crime, extreme danger of crime to the public.
Additionally, I find that the harm caused in this case was so great and unusual that no single prison term for any of the offenses committed as part of this course of conduct adequately reflects the seriousness of your conduct, and I feel that your history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by yourself.
The court's remarks were in complete accord with the requirements of R.C. 2929.14(E).
This assignment of error is without merit.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _________________________________ ANN DYKE, ADMINISTRATIVE JUDGE
PATRICIA A. BLACKMON, J., AND JOSEPH J. NAHRA, J.,* CONCUR.
* Sitting by Assignment: Judge Joseph J. Nahra, retired, of the Eighth District Court of Appeals.
[1] The mass murder specification was dismissed by the court before the matter was submitted to the jury.
[2] Prior to allowing Ortiz to testify before the jury, the court conducted a voir dire examination of Ricardo Ortiz to determine whether his testimony could be presented to the jury. Ortiz testified that he was jailed in Cuyahoga County in order to provide information concerning drug trafficking in the Cleveland area. He was subsequently placed in pod 11C with defendant and had conversations with him. He admitted that he understood that he was to serve a portion of his sentence in county jail and was upset when he was transferred to Lorain. He then wanted to give information to the police in order to reduce his sentence. At no time did police instruct Ortiz to obtain any information concerning this homicide, however.
[3] The trial court also conducted a voir dire hearing regarding the admissibility of this testimony before permitting Bouyer to testify. Bouyer stated that he was incarcerated in county jail awaiting charges of drug abuse and possession of criminal tools. He provided information regarding this homicide and eventually pled to a misdemeanor charge. He stated that Reddix was his friend and that caused him to contact police regarding this homicide. He denied receiving favorable treatment in exchange for this information and stated that defendant talked a lot about this matter.
He admitted, however, that he is awaiting sentencing.
[4] Paradoxically, defendant's trial counsel outlined the dangers of providing information but also named persons not involved in this matter whom he believed to be snitches.